**Toney PENDLETON, Plaintiff, Appellant,**

v.

**CITY OF HAVERHILL, et al., Defendants, Appellees.**

**No. 97–2376.**

United States Court of Appeals, First Circuit.

Heard June 3, 1998.

Decided Sept. 1, 1998.

---

Thomas J. Gleason for appellant.

Stephen C. Pfaff, with whom Douglas I. Louison and Merrick and Louison were on brief, for appellees.

Before TORRUELLA, Chief Judge, SELYA, Circuit Judge, and SCHWARZER,* Senior District Judge.

* Of the Northern District of California, sitting by

SELYA, Circuit Judge.

This appeal presents a problematic First Amendment question as to whether the plaintiff was a "limited-purpose public figure" required to prove actual malice in order to recover for defamation. After careful consideration of this, and other, issues, we reject the plaintiff's appeal.

## I. THE PREDICATE FACTS

Plaintiff-appellant Toney Pendleton, an African American in his mid-forties, hails from Haverhill, Massachusetts. He is well known in the community both because of his family ties and because of his exploits as a high-school athlete.

### A. *The Job Market.*

Starting in the late 1980s, Pendleton tried to land a full-time teaching position in the Haverhill public school system. Although he worked as a substitute teacher from time to time, he progressed no further. In August 1993, he vented his frustration to a reporter, Anita Perkins, who found considerable irony in Pendleton's inability to secure a permanent teaching position notwithstanding a student-led outcry for a more diverse public school faculty. She wrote an article to that effect in the Lawrence Eagle–Tribune, a newspaper serving the Haverhill area. *See* Anita Perkins, *Black Teacher Has Grown Impatient Awaiting A Chance,* Eagle–Trib., Aug. 17, 1993, at 13.

Perkins's article profiled Pendleton and described his family, educational background, career aspirations, temporary teaching assignments, and his trepidation that school officials were not giving appropriate priority to minority hires. Reflecting on his experience as an African–American student in the Haverhill schools, Pendleton was quoted as saying: "Twenty years later things are still the same." He also was quoted as asking, rhetorically: "How can you expect a black child who is called a 'n_____' to go to a white counselor and teacher with his feelings?" The article commented on the dearth of minority teachers in the Haverhill schools, de-

designation.

scribed some of the steps that Haverhill had taken to increase minority representation within the school system, and concluded with Pendleton's plaintive comment: "I'm tired of substitute teaching. I just want a chance to show my qualifications."

That fall, Pendleton accepted a Haverhill-based position as a vocational counselor with Jobs For Bay State Graduates, Inc. (JBSG), a private, nonprofit organization. JBSG counselors advise public school students who do not plan to attend college about career opportunities. Pendleton held this job at the time of his arrest.

### B. *Arrest and Prosecution.*

On the evening of May 27, 1994, Pendleton parked his car on a busy, well-lit street in his home town, ran some errands, and then repaired to a local tavern. At some point, Arnaldo Pagan, a boyhood friend, asked Pendleton to give him a ride home. After Pagan grew increasingly insistent, Pendleton acquiesced. The two men then proceeded to Pendleton's automobile. The vehicle was still parked when two Haverhill policemen on routine neighborhood patrol shined a flashlight into it. The officers, John Arahovites and Lawrence Newman, claimed that "two heads popped up" from behind the dashboard and that they noticed a powdery substance on Pendleton's face. Upon further investigation, the officers observed powder on Pagan's lap and throughout the car's interior. They also saw a small bag containing what appeared to be cocaine on the floor of the vehicle. Based on these observations, the gendarmes promptly arrested Pendleton and Pagan.

Pendleton's arrest made front-page news in both the Eagle–Tribune and a competing newspaper, the Haverhill Gazette. The stories revealed that charges of cocaine possession and conspiracy to violate the drug laws had been brought against Pendleton in the state district court. The articles described Pendleton as a "school jobs counselor" and a "high school advisor" who worked in a classroom five days a week with 30 to 40 high-school seniors.

Pendleton entered a not guilty plea. At a court hearing on July 12, 1994, he asserted that when Pagan, after entering his vehicle, produced a small plastic bag, he (Pendleton) suspected the bag contained drugs and slapped it out of Pagan's hand. In turn, this act caused the contents to spill onto Pagan's lap and scatter throughout the car. In responding to an unrelated inquiry from the court, the prosecutor admitted that, due to a mix-up, the powder seized from Pendleton's car had not been tested. The judge obviously did not like what he had heard. He declared Pendleton not guilty and dismissed the charges.

### C. *Subsequent Events.*

A flurry of media reports followed the case's termination. In them, the district attorney's office accused the police of bungling the investigation and the police chief responded that delays in laboratory testing are sometimes an inevitable concomitant of the evidence-gathering process. As part of this coverage, a local reporter interviewed Pendleton and his attorney. The lawyer theorized that Pendleton had been in the wrong place at the wrong time, and that he now could "get back to doing ... positive things in the community," such as "helping kids." Bill Burke, *Pendleton Tells His Side: But Did Police Drop The Ball?*, Haverhill Gazette, July 14, 1994, at A1. Pendleton asserted that he was "the happiest guy in America that my innocence has been borne out." *Id.*

On July 18, the arresting officers responded to a call from the Eagle–Tribune. At the newspaper's offices, Arahovites and Newman voiced indignation over the disposition of the charges, emphasizing that they had not been notified about the July 12 proceeding and expressing disappointment that the judge had refused to order Pendleton to undergo drug rehabilitation. *See* Bill Cantwell & Eileen Pendleton, *Judge's Release Of Suspect Outrages Police*, Eagle–Trib., July 18, 1994, at 1. The article quoted Arahovites as saying that the police were "not trying to crucify Pendleton," but "[t]hat guy should be in rehab right now." *Id.* When arrested, Arahovites said, Pendleton "had coke all over his face, from the tip of his chin to his eyebrows," unlike "[a] first-time user [who] would not have had it all over his face."

The same article reported Arahovites's claims that he had "never made an arrest where there was this much cocaine on a person's face," and that he had found "a big bag of cocaine at [Pendleton's] feet." *Id.* Finally, the journalists noted Arahovites's protest that the officers should not be held accountable for Pendleton's predicament. In Arahovites's words, "[t]hese guys [Pendleton and Pagan] were doing cocaine and they got caught. Period." *Id.* Thus, despite the fact that Pendleton "was fighting for a school department job" and "outside forces [were] fighting for him to become a teacher," he had only himself to blame if the negative publicity hampered his bid. *Id.*

On August 18, 1994, JBSG terminated Pendleton's employment.

## II. THE PROCEEDINGS BELOW

On December 19, 1995, Pendleton sued the city of Haverhill, Arahovites, and Newman in the federal district court.[1] In pertinent part, his complaint invoked 42 U.S.C. § 1983 (1994) and claimed that the officers' post-acquittal statements to the press violated his constitutional rights. The complaint also alleged various state-law claims, including counts for defamation, infliction of emotional distress, invasion of privacy, negligence, negligent supervision, and malicious interference with employment relations.

After protracted pretrial discovery, the defendants moved for summary judgment. The district court, ruling from the bench, granted *brevis* disposition (i) in Newman's favor on all claims, (ii) in Arahovites's and the city's favor with respect to the section 1983 claims, and (iii) exercising supplemental jurisdiction, *see* 28 U.S.C. § 1367(c), in the defendants' favor on all other causes of action save for the defamation claim against Arahovites.

Trial on the surviving count commenced on October 27, 1997. At the conclusion of the evidence, the court entertained arguments as to whether Pendleton should be deemed a

public figure, and if so, to what extent. Noting the nature of Pendleton's work in the public schools, his stature in the Haverhill community, the fact that charges against him were a matter of public interest, and his willingness to "engage[ ] in th[e] process of communication in the form of a newspaper interview, just as the defendant did," the court concluded that Pendleton was a limited-purpose public figure and instructed the jury accordingly. The jurors returned a take-nothing verdict. This appeal followed.

Pendleton now assigns error to the pretrial entry of partial summary judgment, three evidentiary rulings that occurred at trial, and the public figure status determination. We address his asseverations in accordance with these groupings.

## III. THE PRETRIAL RULINGS

The district court granted summary judgment on seven of the enumerated counts lodged in Pendleton's complaint. Pendleton does not challenge any of them as they pertain to Newman, but he does challenge four of the rulings as they pertain to Arahovites and Haverhill. We review these determinations de novo, taking the facts as they appeared in the summary judgment record in the light most hospitable to Pendleton. *See Elliott v. S.D. Warren Co.,* 134 F.3d 1, 9 (1st Cir.1998).

### A. *The Section 1983 Claims.*

Section 1983 "provides a cause of action when an individual, acting under color of state law, deprives a person of federally assured rights." *Camilo–Robles v. Hoyos,* 151 F.3d 1, 5 (1st Cir.1998). Pendleton's section 1983 claims hypothesize that Arahovites's scurrilous statements to the press led JBSG to discharge Pendleton, thereby depriving him of a liberty interest protected by the Due Process Clause of the Fourteenth Amendment.[2]

The Supreme Court has determined authoritatively that defamation, even

---

1. Pendleton also sued JBSG for wrongful termination of employment. Inasmuch as the parties settled this claim on the eve of trial, we omit all further reference to it.

2. As an at-will employee of a private nonprofit organization, Pendleton had no constitutionally protected property interest in the job that he lost.

from the lips of a government actor, does not in and of itself transgress constitutionally assured rights. *See Paul v. Davis,* 424 U.S. 693, 700–01, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (establishing that although state law may provide a remedy for defamatory statements uttered by a government official, no cognizable constitutional harm ordinarily occurs). In an effort to avoid this holding and to state an actionable section 1983 claim grounded upon defamation, Pendleton strives to fit his case into the narrow category of situations that involve more than simple stigmatization. These precedents discern a deprivation of a constitutionally protected liberty interest when, in addition to mere reputational injury, words spoken by a government actor adversely impact a right or status previously enjoyed under state law. *See id.* at 708–09, 96 S.Ct. 1155; *Rodriguez de Quinonez v. Perez,* 596 F.2d 486, 489 (1st Cir.1979); *Dennis v. S & S Consol. Rural High Sch. Dist.,* 577 F.2d 338, 341 (5th Cir.1978). Because his case juxtaposes slanderous language and loss of employment, Pendleton posits that it comes within this "stigma plus" rubric. The district court did not agree. Nor do we.

■ In the first place, to achieve a sufficient "plus" in a loss-of-job context, words spoken must be "uttered incident to the termination." *Siegert v. Gilley,* 500 U.S. 226, 234, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). Here, however, the alleged defamation and the decision to cashier Pendleton came from two separate, unrelated sources, and the former cannot plausibly be said to have occurred "incident to" the latter. As such, the allegedly defamatory remarks cannot be viewed as working a denial of a previously recognized right or status.[3]

■ In the second place, a violation of constitutional proportions under a "stigma plus" theory exists only if, and to the extent that, the opportunities lost are government benefices denied as a result of governmental action. *See Paul,* 424 U.S. at 708–09, 96 S.Ct. 1155; *Rodriguez de Quinonez,* 596 F.2d at 489. Pendleton's claim founders on these shoals: he worked for a non-governmental employer and lost a private (not a public) position. Although JBSG receives some financial assistance from the Commonwealth of Massachusetts and operates within the public school system, it is not an arm of the state.[4] *See Rendell–Baker v. Kohn,* 457 U.S. 830, 840, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982).

■ To the extent that Pendleton asserts section 1983 claims apart from his claim that Arahovites deprived him of a liberty interest, we dismiss them out of hand. Some of these claims (e.g., his allegations that the officers falsified their reports and acted out of racial animus) are simply unsupported by the evidence. Others (e.g., Pendleton's assertion that his federal civil rights were violated because Arahovites spoke out in contravention of departmental rules) are legally impuissant. *See, e.g., Snowden v. Hughes,* 321 U.S. 1, 11, 64 S.Ct. 397, 88 L.Ed. 497 (1944); *Colon v. Schneider,* 899 F.2d 660, 672 (7th Cir.1990). Finally, in the absence of individual liability on any officer's part, Pendleton's counterpart section 1983 claims against Haverhill, as the officers' municipal employer, cannot succeed. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Evans v. Avery,* 100 F.3d 1033, 1039 (1st Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1693, 137 L.Ed.2d 820 (1997).

### B. The Tort Claims.

On appeal, Pendleton concedes the propriety of summary judgment on many of his state-law tort claims, but challenges the rejection of his claims for negligence, invasion of privacy, and malicious interference with

---

3. In all events, at the summary judgment stage Pendleton relied on sheer speculation and failed to establish any tangible connection between Arahovites's statements and his ouster at the hands of JBSG's president, Mary Connelly (who gave a myriad of other reasons for JBSG's decision).

4. Pendleton would fare no better if he attempted to recast the harm suffered as the loss of a future opportunity to work as a teacher in the Haverhill school system. *Siegert* stands for the proposition that, in comparable circumstances, impairment of "future employment prospects" does not constitute a constitutional deprivation. 500 U.S. at 234, 111 S.Ct. 1789.

employment relations. The subject warrants scant comment.

■ To prevail on a negligence claim under Massachusetts law, a plaintiff must show (1) that the defendant owed him a duty, (2) that the defendant breached the duty, and (3) that the breach caused the plaintiff's injuries. *See Cannon v. Sears, Roebuck & Co.*, 374 Mass. 739, 374 N.E.2d 582, 584 (1978). In this case, Pendleton conclusorily attributed the loss of his employment to Arahovites's remarks, but he did not produce evidence at the summary judgment stage sufficient to permit a finding that these remarks prompted JBSG to fire him. Absent such evidence, his claim is untenable. *See, e.g., Poskus v. Lombardo's of Randolph, Inc.*, 423 Mass. 637, 670 N.E.2d 383, 385–86 (1996).

■ Pendleton's malicious interference claim suffers from the same defect. And, moreover, Pendleton failed to proffer any evidence related to another essential element of this claim; the summary judgment record contains no proof that Arahovites knowingly attempted to induce JBSG to act. *See G.S. Enters., Inc. v. Falmouth Marine, Inc.*, 410 Mass. 262, 571 N.E.2d 1363, 1369 (1991).

■ The privacy claim is no more substantial. Pendleton never identified the specific statements that supposedly intrude upon his privacy, nor can we glean the essentials of an actionable claim from the summary judgment record. Massachusetts law prohibits unreasonable public disclosure of *private* information. *See* Mass. Gen. Laws. ch. 214, § 1B; *see also Bratt v. International Bus. Mach. Corp.*, 392 Mass. 508, 467 N.E.2d 126, 134 (1984). But this does not profit Pendleton because neither Arahovites's descriptions nor perceptions of Pendleton's conduct in a public place constitute private information. *See generally United States v. Dionisio*, 410 U.S. 1, 14, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (concluding that there is no reasonable expectation of privacy in one's appearance); *Brown v. Hearst Corp.*, 862 F.Supp. 622, 631 (D.Mass.1994) (explaining that there can be no expectation of privacy vis-à-vis information that has already filtered into the public domain), *aff'd*, 54 F.3d 21 (1st Cir.1995); *Whirty v. Lynch*, 27 Mass.App.Ct. 498, 539

N.E.2d 1064, 1065 (1989) (sanctioning release of information pertaining to plaintiff's criminal background). The cases upon which Pendleton relies in his struggle to reach a contrary result are plainly distinguishable because they deal with quintessentially private information. *See, e.g., Pressman v. Brigham Med. Group Found., Inc.*, 919 F.Supp. 516, 524 (D.Mass.1996) (medical information); *Gauthier v. Police Comm'r*, 408 Mass. 335, 557 N.E.2d 1374, 1376 (1990) (toxicology results).

## IV.   THE EVIDENTIARY RULINGS

Pendleton challenges three evidentiary rulings. Two of these relate to the exclusion of evidence and the third relates to the admission of evidence. In each instance, we review the district court's determination for abuse of discretion. *See Williams v. Drake*, 146 F.3d 44, 47 (1st Cir.1998); *Blinzler v. Marriott Int'l, Inc.*, 81 F.3d 1148, 1158 (1st Cir.1996).

### A.   *Negative Drug Test Results.*

■ At trial, Pendleton sought to introduce evidence that he tested negative for drugs on the Tuesday following his Friday night arrest. Arahovites objected on relevancy grounds. Judge O'Toole called counsel to the bench and asked Pendleton's lawyer what the jury could conclude from this evidence. Counsel replied that the evidence tended to show that "he [Pendleton] doesn't have a drug problem." The judge then asked the lawyer: "Is it evidence that [Pendleton] did not ingest any amount of cocaine on Friday night?" The lawyer responded in the negative. After a further colloquy, the judge ruled that Pendleton could show "the fact of the test" and that he voluntarily arranged for it, but not the results.

We discern no misuse of discretion in the trial court's exclusion of the test results. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Fed. R.Evid. 401. Since—as Pendleton readily admits—a negative test result on Tuesday lacks probative value as to whether Pendle-

ton was using cocaine on the previous Friday, the court did not abuse its discretion in ruling that the test results were irrelevant to Arahovites's statements about Pendleton's cocaine use on the night of the arrest. *See, e.g., United States v. Levy–Cordero,* 67 F.3d 1002, 1016 (1st Cir.1995), *cert. denied,* 517 U.S. 1162, 116 S.Ct. 1558, 134 L.Ed.2d 659 (1996); *United States v. Brandon,* 17 F.3d 409, 444 (1st Cir.1994); *see also* Fed.R.Evid. 402.

■■■■ In this venue, Pendleton embroiders his argument, contending that he should have been allowed to introduce the negative test results as evidence tending to disprove Arahovites's general suggestion that Pendleton had a drug problem. We disagree. Even if the officer's opinion could be construed as defamatory—a matter on which we take no view, *see Fudge v. Penthouse Int'l, Ltd.,* 840 F.2d 1012, 1016 (1st Cir.1988) ("If the challenged statement is one of opinion rather than fact, then under the First Amendment, it generally cannot give rise to a defamation claim.")—the proffered evidence does not prove or disprove whether Pendleton regularly used drugs. At most, it establishes that Pendleton had no drugs in his bloodstream at the time the test was administered (and, perhaps, that he had not used drugs immediately prior thereto). These are topics that Arahovites did not broach in his allegedly defamatory comments.

### B. *Police Department Rules and Regulations.*

Pendleton next challenges the trial court's decision to exclude the testimony of Deputy Chief Shea, who Pendleton sought to question about the Haverhill police department's rules regarding dissemination of information to the press. Pendleton offered Shea's testimony to assist in establishing malice. Specifically, Pendleton's counsel told the court that this testimony would show "how deeply [Arahovites] felt about [speaking out], how much he wanted to do it, that he would violate all of these rules" against talking to the press.

■■■■ This iteration of relevancy misapprehends the concept of "actual malice" in defamation law. In the defamation context, "malice" does not relate to the defendant's motive for speaking, or even to whether the defendant made the challenged statement out of ill-will. Rather, "malice" for this purpose requires proof that the speaker published the statement with knowledge of its falsity or with reckless disregard as to whether it was false. *See St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *Milgroom v. News Group Boston, Inc.,* 412 Mass. 9, 586 N.E.2d 985, 987 (1992). Pendleton did not offer Shea's testimony for any purpose bearing on these issues, but, rather, according to his offer of proof, in an endeavor to link evidence of rule violations to Arahovites's motive for having made the allegedly defamatory statements. Motive, however, is not an element of a defamation claim under Massachusetts law. *See McAvoy v. Shufrin,* 401 Mass. 593, 518 N.E.2d 513, 517 (1988). Hence, the trial court properly sustained Arahovites's objection.[5]

### C. *The Second Bag of Cocaine.*

■■■■ During Arahovites's direct examination, the following snippet of testimony emerged:

> **DEFENSE COUNSEL:** Do you know what evidence was obtained at the time of the arrest of Mr. Pendleton by you or Officer Newman?
>
> **ARAHOVITES:** Yes.
>
> **DEFENSE COUNSEL:** What was it?
>
> **ARAHOVITES:** The bag of cocaine—there was one bag of cocaine that was found in the car that was charged to Mr. Pendleton, and there was another bag of cocaine that was found in the back seat of our police cruiser.... There was another bag of cocaine that came from Mr. Pagan that was in the back seat of our cruiser.

Pendleton objected to this testimony on relevancy grounds and argues here that evidence regarding the second bag of cocaine was both irrelevant and prejudicial. He is half-right:

---

5. At the expense of carting coal to Newcastle, we note that we have carefully reviewed the rules and regulations identified by Pendleton, and harbor serious doubts that Arahovites could be said to have violated any of them.

the evidence was irrelevant and the objection should have been sustained.

Pendleton is also half-wrong: the error was benign. The second bag of cocaine was mentioned to the jury only once.[6] In that passage, quoted above, Arahovites made it crystal clear that the second bag belonged to Pagan, not Pendleton. This fact dovetailed with—and arguably bolstered—Pendleton's assertion that Pagan was the drug user and that he (Pendleton) was merely an innocent bystander. Under the circumstances, we conclude that the error in permitting Arahovites's statement to stand was harmless and does not warrant a new trial. *See United States v. Ladd,* 885 F.2d 954, 957 (1st Cir. 1989); *see also* Fed.R.Civ.P. 61.

## V. THE STATUS DETERMINATION

The principal issue on appeal concerns the correctness of the lower court's determination that Pendleton was a limited purpose public figure. Pendleton challenges both the judge's authority to make this determination (rather than submit the question to the jury) and the substance of the determination itself. We subdivide our analysis into three segments, plotting the legal landscape and tackling Pendleton's procedural point before grappling with the merits.

### A. *The Legal Landscape.*

In an effort to strike a balance between First Amendment freedoms and state defamation laws, our jurisprudence accords decretory significance to the status of each individual plaintiff. Under the taxonomy developed by the Supreme Court, private plaintiffs can succeed in defamation actions on a state-set standard of proof (typically, negligence), whereas the Constitution imposes a higher hurdle for public figures and requires them to prove actual malice. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342–48, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *New York Times Co. v. Sullivan,* 376 U.S. 254, 283, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Kassel v. Gannett Co.,* 875 F.2d 935, 938 (1st Cir.1989); *Bruno & Stillman, Inc. v. Globe Newspaper*

*Co.,* 633 F.2d 583, 586–88 (1st Cir.1980). We briefly summarize the evolution of the law in this area.

In 1964, the Court considered for the first time the issue of "the extent to which the constitutional protections for speech and press limit a State's power to award damages in a libel action brought by a public official against critics of his official conduct." *New York Times,* 376 U.S. at 256, 84 S.Ct. 710. Due in large part to the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *id.* at 270, 84 S.Ct. 710, the Court concluded that even falsehoods are entitled to some constitutional protection when directed at public officials, *see id.* at 282–83 & n. 21, 84 S.Ct. 710. Thus, the Constitution does not allow a public official to recover damages for defamation unless he establishes with "convincing clarity" that the defamatory statements were published with "actual malice." *Id.* at 285–86, 84 S.Ct. 710.

Two years later, the Court found occasion to consider who qualified as a "public official" for the purpose of applying the *New York Times* rule. In *Rosenblatt v. Baer,* 383 U.S. 75, 85, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), the Justices held that "the 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." At base, the designation covers those government employees in positions that "would invite public scrutiny and discussion of the person holding [them], entirely apart from the scrutiny and discussion occasioned by [any] particular charges in controversy." *Id.* at 86 n. 13, 86 S.Ct. 669.

During its next term, the Court extended the *New York Times* rule to defamation cases in which the plaintiff, though not a government official, was a "public figure." *Curtis Pub. Co. v. Butts,* 388 U.S. 130, 155, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). The

---

**6.** We think it noteworthy that Arahovites's counsel never mentioned the second bag of cocaine in opening or closing arguments, nor did he in any

way attempt to conjoin that evidence with Pendleton's alleged drug use.

Justices considered public figures to be those who "commanded sufficient public interest and had sufficient access to the means of counterargument to be able to expose through discussion the falsehood and fallacies of the defamatory statements." *Id.* (citation and internal quotation marks omitted).

■ After some short-lived experimentation, *see, e.g., Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 43–44, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), the Court settled on a defamation model that ties the constitutionally required showing in a defamation action to the plaintiff's status. It contemplated that "public figure" status usually would arise in one of two ways: (1) when persons "assume[ ] roles of especial prominence in the affairs of society," perhaps by occupying positions of "persuasive power and influence," or (2) when persons "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz,* 418 U.S. at 345, 94 S.Ct. 2997.[7] The Court noted, however, that not all public figures are equal: an individual who achieves "pervasive fame or notoriety," or otherwise comes within the first category, is deemed a public figure for all purposes, whereas an individual who dives headfirst into troubled waters, or otherwise comes within the second category, "becomes a public figure only for a limited range of issues." *Id.* at 351, 94 S.Ct. 2997. That range is identified "by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Id.* at 352, 94 S.Ct. 2997.

**B. *Judge or Jury.***

■ Turning from the general to the particular, we first mull Pendleton's claim that Judge O'Toole usurped the jury's province by making the public figure determination himself. In addressing this issue, we do not write on a pristine page. The *Rosenblatt* Court declared that "it is for the trial judge in the first instance to determine whether the proofs show [the plaintiff] to be a 'public official,'" 383 U.S. at 88, 86 S.Ct. 669, and it explained that ceding this responsibility to the bench reduced the chance that jurors might "use the cloak of a general verdict to punish unpopular ideas or speakers," *id.* at 88 n. 15, 86 S.Ct. 669. Extrapolating from this pronouncement, a number of federal courts (including this one) have treated First Amendment status determinations as grist for the court's—not the jury's—mill. *See, e.g., Lundell Mfg. Co. v. American Broad. Cos.,* 98 F.3d 351, 362 (8th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1470, 137 L.Ed.2d 683 (1997); *Reuber v. Food Chem. News, Inc.,* 925 F.2d 703, 708 (4th Cir.1991); *Marcone v. Penthouse Int'l Mag. for Men,* 754 F.2d 1072, 1081 n. 4 (3d Cir.1985); *Rebozo v. Washington Post Co.,* 637 F.2d 375, 379 (5th Cir.1981); *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1293 n. 12 (D.C.Cir.1980); *see also Penobscot Indian Nation v. Key Bank,* 112 F.3d 538, 561 (1st Cir.1997) (describing "public figure status" as presenting "a question of law," notwithstanding that it "necessitates a detailed fact-sensitive determination"), *cert. denied,* —— U.S. ——, 118 S.Ct. 297, 139 L.Ed.2d 229 (1997).

Ignoring these authorities, Pendleton exhorts us to adopt the more particularized interpretation of the *Rosenblatt* rule explicated in *Stone v. Essex County Newspapers, Inc.,* 367 Mass. 849, 330 N.E.2d 161 (1975).[8] Using *Stone* as a talisman, he insists that a court may make the public figure determination only if the facts bearing thereon are uncontroverted. Building on this foundation, Pendleton then asserts that the public figure question in this case should have been sub-

---

7. The *Gertz* Court mentioned a third category—a person who becomes a public figure "through no purposeful action of his own"—but commented that "the instances of truly involuntary public figures must be exceedingly rare." 418 U.S. at 345, 94 S.Ct. 2997.

8. In *Stone,* the Massachusetts Supreme Judicial Court ventured that

a full statement of the [*Rosenblatt*] rule would seem to be that the question whether the plaintiff is a public official or a public figure is one for the court to answer whenever (a) all of the facts bearing thereon are uncontested or agreed by the parties[,] (b) the case is tried before a judge without a jury, or (c) all of the facts bearing thereon are specially found and reported by the jury by way of answers to special questions submitted to them....

*Stone,* 330 N.E.2d at 170.

mitted to the jury because the parties disagreed as to whether Pendleton injected himself into a public controversy to such an extent that he became a limited-purpose public figure.

We reject Pendleton's importuning. The principal problem with his argument is that it assumes (wrongly, we believe) that the question of whether a person is sufficiently entangled in a public controversy to qualify him as a limited-purpose public figure is for the jury. That question is of constitutional dimension and, thus, federal law controls. Consistent with the federal precedents assembled above, which illustrate that the status issue is treated in federal defamation jurisprudence as a question of law, we hold that the question of whether a defamation plaintiff is a public figure is properly resolved by the court, not by the jury, regardless of the contestability of the predicate facts.

■■■ In this case, moreover, all roads lead to Rome. The record reveals complete accord as to who Pendleton was and what he did and said both before and after the events of May 27, 1994. There is no conflict as to any material fact; the issue is whether the discerned facts suffice to establish that Pendleton acted in a way sufficient to make him a public figure for the purpose of this defamation action (say, by previously achieving pervasive fame and notoriety, or by injecting himself into a public controversy). We have no doubt that this archetypical legal question is exactly the sort of inquiry that the *Rosenblatt* Court intended the judge to handle. Hence, the trial court did not err in ruling directly on the public figure question.

### C. *Pendleton's Status.*

We turn now to the efficacy of Judge O'Toole's determination that Pendleton, although not a public official, was a limited-purpose public figure. As with other questions of law, we afford plenary review to this determination. *See McCarthy v. Azure*, 22 F.3d 351, 354 (1st Cir.1994).

■■■ Some of the arguments advanced in support of the proposition that Pendleton was a limited-purpose public figure are ca-

nards. It is by now apodictic that an individual's involvement in a criminal proceeding—even one that attracts substantial notoriety—is not enough, in itself, to ingeminate public figure status. *See Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 168, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979). By like token, one does not become a public figure merely by defending oneself publicly against accusations. *See Time, Inc. v. Firestone*, 424 U.S. 448, 454 n. 3, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976); *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1558 (4th Cir.1994). Finally, Arahovites's claim that Pendleton achieved pervasive fame as a sports star at Haverhill High School two decades ago and retains that celebrity to this day elevates hope over reason. The passage of time obviously diluted whatever fame the now forty-something-year-old Pendleton had acquired during his adolescent heyday.

These false starts notwithstanding, we glean from the appellees' briefs and the trial court's bench decision several other suggested bases on which the court's decision arguably might rest. Rather than canvassing the universe of possibilities, we proceed directly to the strongest argument in support of this determination, mindful that an appellate court possesses the power to affirm a lower court's rulings of law on any independent ground made manifest by the record. *See Polyplastics, Inc. v. Transconex, Inc.*, 827 F.2d 859, 860–61 (1st Cir.1987).

■■■ In mid–1993, Pendleton effectively announced his candidacy to become a permanent teacher within the Haverhill school system. He proclaimed as much in a newspaper story (entitled "Black Teacher Has Grown Impatient Awaiting A Chance") that featured him and his aspiration. Although the record is bereft of information regarding the genesis of this published profile, the article speaks eloquently for itself.

Its author, Anita Perkins, describes a school system employing 480 full-time teachers, only 15 of whom are minorities, to instruct 7,500 pupils, approximately 1,050 of whom are minorities. Perkins reports Pendleton's avowal that the Haverhill school system, in which minorities account for 14% of the student body but only 3% of the faculty,

is not taking appropriate steps to increase the number of minority instructors. In Pendleton's opinion, "school officials are not making minority hirings a priority,"—a failing that he says leaves minority students without suitable role models.

The gist of the article is that Pendleton, a Haverhill native with a degree from the University of Massachusetts and ample experience working with Haverhill youths, should be given a teaching opportunity. Perkins discusses Pendleton's "lifelong dream of teaching in the schools that gave him and his family so much," and explains that, despite completing two years as a substitute teacher in a Haverhill school, "three attempts to land a really permanent position in the city schools failed." The article concludes with Pendleton's poignant lament: "I am tired of substitute teaching. I just want a chance to show my qualifications."

In addition to conveying Pendleton's views, Perkins reported that, following a recent spate of racially tinged incidents at Haverhill High School, students of all hues "called for more minority teachers, a recommendation school officials said they would heed." This, and similar statements in the article, make it transparently clear that the racial attributes of the teacher-pupil mix by then had become a matter of public concern. This circumstance possesses great significance for a First Amendment analysis: by granting an interview to Perkins and lobbying for a permanent teaching post at a time when the racial composition of the public school faculty had become a matter of intense interest in the community, Pendleton invited public scrutiny of the qualities that equipped him to teach in the Haverhill school system. Accordingly, he became a public figure for that limited purpose.

We base this conclusion, in part, on the case law concerning candidates for public office. *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971), involved a claim that a newspaper was liable for erroneously reporting that a senatorial candidate was a "former small-time bootlegger." *Id.* at 266, 91 S.Ct. 621. The candidate sued, maintaining that he need not prove actual malice because he had never

held a public office. The Court demurred, holding that "publications concerning candidates must be accorded at least as much protection under the First and Fourteenth Amendments as those concerning occupants of public office." *Id.* at 271, 91 S.Ct. 621. In a companion case decided the same day, the Court reiterated its conclusion that candidates for public office—there, a candidate for a position as a county tax assessor—fall within the purview of the *New York Times* rule. *See Ocala Star–Banner Co. v. Damron,* 401 U.S. 295, 299, 91 S.Ct. 628, 28 L.Ed.2d 57 (1971).

We believe that, by analogy, these holdings are instructive in respect to the circumstances at bar. Of course, unlike the candidates in *Monitor Patriot* and *Ocala Star–Banner,* Pendleton was not running for an elected political office—but it is at least arguable that if a person holds (or aspires to hold) any public post which entails control over matters of substantial public concern, then his qualifications for serving in that capacity are likely to engender the type of public debate and discussion that the First Amendment protects. *See Rosenblatt,* 383 U.S. at 85–86. After all, the Court's defamation jurisprudence makes no distinction between government officials who are selected by the voters and those who are selected in other ways, and logic suggests that it is the status of the official, not the manner in which he attains (or hopes to attain) the office, that is the key determinant of the extent to which state defamation law can be allowed to curb free discussion.

■ Here, however, we need not rely solely on this rationale. The Perkins article leaves no doubt that an independent public controversy existed within Haverhill regarding the need to increase minority faculty representation and the adequacy of the measures employed by school officials to that end. Pendleton voluntarily injected himself into this preexisting controversy in at least three ways: by making (and authorizing the publication of) statements bearing on the issue; by airing his qualifications in a manner calculated to suggest that hiring him would ameliorate the problem; and by seeking to influence public opinion not only on the desir-

ability of more minority hires, but also on the virtues of his own candidacy for such employment. In short, when Pendleton stated, "I just want a chance to show my qualifications," he invited public debate both on the general issue of minority representation and on the specific characteristics that made him suitable (or not) for a teaching position.

We think that this conclusion comports comfortably with the teachings of *Gertz*. Pendleton had "access to the channels of effective communication," 418 U.S. at 344, 94 S.Ct. 2997, as evidenced by the fact that his arrest on cocaine charges made the front page of both the Gazette and the Eagle–Tribune well prior to the uproar over his exoneration. Similarly, the *Gertz* Court's statement that "[a]n individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs," among them, "the risk of closer public scrutiny than might otherwise be the case," 418 U.S. at 344, 94 S.Ct. 2997, informs our assessment.

To be sure, there may be a temporal dimension to any "limited-purpose public figure" analysis. Intuitively, one should not become fair game for eternity merely by injecting oneself into the debate of the moment. *Cf. Rosenblatt*, 383 U.S. at 87 n. 14, 86 S.Ct. 669 (hypothesizing that "there may be cases where a person is so far removed from a former position of authority that comment on the manner in which he performed his responsibilities no longer has the interest necessary to justify [applying] the *New York Times* rule"). The case law, however, tends to contradict this intuition. *See* Alan Kaminsky, Note, *Defamation Law: Once A Public Figure Always A Public Figure?*, 10 Hofstra L.Rev. 803, 812–13 (1982) (collecting cases). Yet, we need not probe this point, for the temporal link in this instance is more than adequate. Perkins's article espousing Pendleton's qualifications appeared in August 1993, less than a year before the utterances that are the subject of this suit. There is no evidence that, in the interim, the controversy about minority faculty representation had

subsided or that Pendleton had abandoned his quest for a permanent teaching position.

Under the circumstances, Pendleton became a limited-purpose public figure whose alleged peccadilloes, even if falsely portrayed, were fair game in the absence of actual malice. Consequently, those with information bearing on Pendleton's qualifications for a teaching position should not be punished for speaking out, absent evidence that they knowingly or recklessly disseminated falsehoods. It follows that, because Arahovites's allegedly defamatory statements relate directly to Pendleton's qualifications for the public position to which he aspired [9] and by extension to the controversy which swirled around that position—a controversy into which Pendleton had thrust himself—the district court correctly applied the *New York Times* rule. *Cf. Monitor Patriot*, 401 U.S. at 277, 91 S.Ct. 621 (holding "as a matter of constitutional law that a charge of criminal conduct ... can never be irrelevant to an official's or candidate's fitness for office").

Let us be perfectly clear. Our conclusion here, as in most public figure cases, is fact-bound and restricted to the specific circumstances revealed in the record. *See Bruno & Stillman*, 633 F.2d at 589 (explaining that "particularized determinations of public figure status are the rule"). We are aware of the scholarly debate surrounding teacher status in the defamation context, *see generally* Eugene C. Bjorklun, *Are Teachers Public Officials For Defamation Purposes?*, 80 West Ed. L. Rep. 527 (1993); Richard E. Johnson, *No More Teachers' Dirty Looks— Now They Sue: An Analysis Of Plaintiff Status Determinations In Defamation Actions By Public Educators*, 17 Fla. St. U.L.Rev. 761 (1990); Peter S. Cane, Note, *Defamation Of Teachers: Behind The Times?*, 56 Fordham L.Rev. 1191 (1988), and we leave that ramified inquiry for another day. To resolve the case at hand, it is unnecessary for us to hold that teachers are public figures for all purposes or that each and every applicant for a teaching post is to be deemed a public figure. What we do hold is

9. Indeed, Arahovites comments were explicitly linked to Pendleton's well-known "fight[] for a school department job."

that when an individual freely comments on a community controversy that he views as precluding his ascension to a government office (such as that of public school teacher) and puts his qualifications into the public realm in a manner that suggests that he is trying to influence public opinion, he becomes a public figure for the purpose of discussions regarding his fitness for the office.

We need go no further. Pendleton made himself a public figure by voluntarily stepping into the midst of an ongoing controversy and inviting the citizenry to judge his bid to become a teacher. Having extended that invitation, he assumed the risk that the ensuing discourse might contain errors of fact—errors for which the speakers, in the absence of a showing of actual malice, could not be held liable. Hence, the court below did not err in requiring Pendleton to prove actual malice as an element of his defamation action.

*Affirmed.*