# United States Court of Appeals
## For the First Circuit

No. 10-1790

JANE MEAD,

Plaintiff, Appellant,

v.

INDEPENDENCE ASSOCIATION; CHRISTINE BRADEN, individually and in
her official capacity as Licensor, Division of Licensing and
Regulatory Services for Maine Department of Health and Human
Services; CATHERINE COBB, individually and in her official
capacity as Director, Division of Licensing and Regulatory
Services for Maine Department of Health and Human Services,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Lipez, Selya, and Howard,
Circuit Judges.

Rufus E. Brown for appellant.
Eric J. Uhl for appellee Independence Association.
Christopher C. Taub, Assistant Attorney General, with whom
William J. Schneider, Attorney General, and Paul Stern, Deputy
Attorney General, were on brief, for appellees Christine Braden and
Catherine Cobb.

July 11, 2012

**LIPEZ, Circuit Judge**.  Jane Mead was fired from her job as administrator of fifteen assisted living facilities operated by Independence Association ("IA") and licensed by the Maine Department of Health and Human Services ("DHHS").  Pursuant to 42 U.S.C. § 1983, Mead filed suit against IA and two DHHS employees in the United States District Court for the District of Maine, alleging that her termination without a hearing infringed her procedural due process rights.  She also asserted a number of state law claims.

In response to a motion to dismiss, the district court dismissed Mead's due process claims, explaining that IA was a non-state actor and thus could not be held accountable under § 1983, and that the complaint failed to allege a constitutional violation by the DHHS employees.  See Mead v. Independence Ass'n, 714 F. Supp. 2d 188, 192-97 (D. Me. 2010).  It then declined to exercise supplemental jurisdiction over Mead's state law claims and dismissed them without prejudice.  See id. at 198-99.

Mead appealed.  We affirm.

**I.**

**A. Factual Background**

We draw the facts from the allegations in the complaint. Until May 4, 2009, Mead was the administrator of IA's fifteen assisted living facilities.  IA is a non-governmental organization whose facilities are licensed by DHHS, and the administrator of

each licensed facility must be approved by DHHS. In addition, DHHS closely monitors the facilities for compliance with its Regulations Governing the Licensing and Functions of Assisted Housing Programs. Catherine Cobb is the director of DHHS's Division of Licensing and Regulatory Services. Christine Braden is a DHHS licensor who reports to Cobb.

On March 6, 2009, Braden conducted an unannounced survey of one of IA's facilities, the Goldeneye Residence ("Goldeneye"). The survey revealed that an IA employee ("SF") had been abusing prescription medications and providing poor care to Goldeneye's residents. Mead had known for some time that SF's behavior was problematic but had not received permission from IA's president to fire SF. On March 11, 2009, Braden met with Mead and "made several accusations blaming [Mead] for how SF was supervised without giving [Mead] an opportunity to explain her role in the matter."

On April 7, 2009, Cobb sent IA a Directed Plan of Correction ("DHHS Plan") for Goldeneye. The DHHS Plan was based on and appended to a Statement of Deficiencies ("DHHS Statement") prepared by Braden. The DHHS Statement described several incidents in which, according to Braden, Mead was not forthcoming with information about SF during Braden's survey. The DHHS Statement also faulted Mead for exposing Goldeneye's residents to unsafe conditions by neglecting to take disciplinary action against SF.

In light of those failings, the DHHS Plan directed IA to replace Mead as Goldeneye's administrator. The DHHS Plan also indicated that IA was entitled to an impartial hearing if it wished to appeal either the DHHS Statement or the DHHS Plan. Mead pressed IA to pursue an appeal, but IA declined to do so.

After receiving the DHHS Plan, but before taking any action against Mead, IA hired an independent investigator to look into Mead's supervision of SF. The investigator recommended that IA fire Mead because of her poor working relationship with IA's president, the DHHS Plan's requirement that Mead be replaced as Goldeneye's administrator, and various management and communication issues that arose during the DHHS survey.

On May 4, 2009, Mead was terminated from employment at IA. IA's vice-president explained to Mead that she had been fired on the basis of the DHHS Statement and her supervision of SF. Mead requested an opportunity to protest her termination before IA's board of directors, but her request was denied. Following her termination, Mead applied for administrative positions in other facilities licensed by DHHS but was "not given further consideration . . . after she disclosed that she had been terminated by IA after [the DHHS Plan] required her to be removed from her position as administrator of the Goldeneye Residence."

**B. Procedural Background**

On November 18, 2009, Mead filed a six-count complaint against IA, Cobb, and Braden in federal district court. The first two counts, reliant on § 1983, alleged that Mead's termination without a name-clearing hearing violated her procedural due process rights. The other four counts asserted various state law claims.

IA, Cobb, and Braden moved to dismiss the complaint for failure to state a claim upon which relief could be granted. See Fed. R. Civ. P. 12(b)(6). In a thoughtful and thorough opinion, the district court explained that Mead had "failed to allege adequate facts demonstrating that IA was a state actor" subject to liability under § 1983. Mead, 714 F. Supp. 2d at 194. As to Cobb and Braden, undisputedly state actors, Mead had "failed to plead facts sufficient to show that the state deprived her" of a constitutional right. Id. at 197. Without a viable due process claim, the district court declined to exercise supplemental jurisdiction over Mead's state law claims. See id. at 198-99. Accordingly, it dismissed the complaint without prejudice to the state law claims being refiled in state court. This timely appeal followed.

## II.

We review the dismissal of Mead's complaint de novo. See Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 7 (1st Cir. 2011). We construe in Mead's favor all well-pleaded facts in the complaint

-5-

and any reasonable inferences to be drawn therefrom.  See Tasker v. DHL Ret. Sav. Plan, 621 F.3d 34, 38 (1st Cir. 2010).

In order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Any statements in the complaint that are either legal conclusions couched as facts or bare bones recitals of the elements of a cause of action are disregarded.  See id.; Ocasio-Hernández, 640 F.3d at 12.  The remaining factual statements are taken as true, and the question becomes whether those statements permit a reasonable inference of liability for the misconduct alleged.  See Iqbal, 556 U.S. at 678.

Mead's due process claims were brought under § 1983, which "supplies a private right of action against a person who, under color of state law, deprives another of rights secured by the Constitution or by federal law."  Santiago v. Puerto Rico, 655 F.3d 61, 68 (1st Cir. 2011) (internal quotation marks omitted).  In order to make out a viable claim under § 1983, "a plaintiff must show both that the conduct complained of transpired under color of state law and that a deprivation of federally secured rights ensued."  Id.

**A.  The Claim Against IA**

Ordinarily, a non-governmental organization like IA is not subject to § 1983 claims.  In some circumstances, though, the conduct of a private party may be "fairly attribut[ed] to the State," Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982), and therefore may constitute action under color of state law.  These circumstances are rare, see Estades-Negroni v. CPC Hosp. San Juan Capestrano, 412 F.3d 1, 4 (1st Cir. 2005), and the plaintiff bears the burden of proving that a private party's acts constitute state action, see Flagg Bros. v. Brooks, 436 U.S. 149, 156 (1978).

We use three tests to determine whether a private party may be considered a state actor: the public function test, the state compulsion test, and the nexus/joint action test.  See Santiago, 655 F.3d at 68; Estades-Negroni, 412 F.3d at 5; Alberto San, Inc. v. Consejo de Titulares del Condominio San Alberto, 522 F.3d 1, 4 (1st Cir. 2008).  Mead relies only on the state compulsion test, which requires that a state exercise such "coercive power or . . . provide[] such significant encouragement, either overt or covert, that the [private party's] choice must in law be deemed to be that of the State." Blum v. Yaretsky, 457 U.S. 991, 1004 (1982).  To survive the dismissal of her claim against IA, then, Mead had to allege that DHHS compelled IA to fire her.

She did not do so.  There is no allegation that DHHS ordered Mead terminated from her employment, which is the essence

of Mead's claim. So far as DHHS was concerned, Mead could have continued to work in some capacity at Goldeneye, as well as remained in her position as the administrator of IA's fourteen other assisted living facilities. The complaint makes clear that IA eliminated those possibilities only after conducting its own investigation into Mead's supervision of SF. Moreover, IA acted at least in part for its own reasons, citing Mead's poor rapport with IA's president as one ground for her termination. Hence, IA's choice to fire Mead cannot "be deemed to be that of the State," Blum, 457 U.S. at 1004, and IA cannot be held accountable for that choice under § 1983.

**B. The Claim Against the DHHS Employees**

Mead alleges that the DHHS employees, Cobb and Braden, deprived her of protected liberty interests without due process. The specific liberty interests she claims are (1) freedom from unreasonable government interference with her private employment; and (2) freedom from stigma accompanied by the loss of her IA job, the loss of her de facto administrator's license, and the imposition of tangible burdens on her future employment prospects. We consider each in turn.

## 1. Unreasonable Government Interference[1]

The right to hold private employment and to pursue one's chosen profession free from unreasonable government interference is encapsulated in the liberty concept of the Due Process Clause. See Greene v. McElroy, 360 U.S. 474, 492 (1959); Truax v. Raich, 239 U.S. 33, 38 (1915). Courts typically have held that this right is implicated only by government interference that is direct and unambiguous, as when a city official demands that a restaurant fire its bartender, see Helvey v. City of Maplewood, 154 F.3d 841, 843-44 (8th Cir. 1998), or a state agency explicitly threatens to prosecute a private company's clients if they continue to contract with the company, see Stidham v. Tex. Comm'n on Private Sec., 418 F.3d 486, 491-92 (5th Cir. 2005).

There are no comparable allegations in this case. Like her claim against IA, Mead's claim against the DHHS employees focuses on the decision to terminate her from employment, not the requirement that she be replaced as Goldeneye's administrator. According to the complaint, as we have already explained, DHHS never prohibited or even discouraged IA from continuing to employ Mead. Mead was fired only after IA carried out its own

---

[1] Cobb and Braden argue that Mead forfeited this theory by failing to raise it below. We disagree. In opposing the dismissal of her complaint, Mead insisted that she was entitled to "protection from unreasonable governmental interference with [her] employment" and cited many of the cases we rely on here. That presentation was sufficient to preserve the issue for our review.

investigation into her performance and discerned deficiencies warranting termination. It follows that Mead has not adequately alleged that there was any unreasonable government interference with her private employment.

## 2. Stigma Plus

A due process claim cannot rest upon reputational harm alone. See Paul v. Davis, 424 U.S. 693, 701-02 (1976) (holding that mere defamation by a state actor does not violate constitutional rights); URI Student Senate v. Town of Narragansett, 631 F.3d 1, 10 (1st Cir. 2011). "Thus, when a person alleges that she has suffered stigmatization at the hands of a government actor, she must show an adverse effect on some interest more tangible than reputational harm." URI, 631 F.3d at 9 (internal quotation marks omitted). That is, "the reputational injury must be accompanied by a change in the injured person's status or rights under substantive state or federal law." Silva v. Worden, 130 F.3d 26, 32 (1st Cir. 1997); see also URI, 631 F.3d at 10. "To use the popular catch phrase, the complaining party must satisfy a 'stigma plus' standard." URI, 631 F.3d at 9.

The stigma in this case is clear. The unmistakable import of the DHHS Statement is that Mead was dishonest during Braden's survey and inattentive to the needs of Goldeneye's residents. See Donato v. Plainview-Old Bethpage Cent. Sch. Dist., 96 F.3d 623, 630-31 (2d Cir. 1996); Rodriguez de Quinonez v. Perez,

596 F.2d 486, 489-90 (1st Cir. 1979). The "plus" is less clear. As noted, Mead has put forward three possibilities: the loss of her IA job, the loss of her de facto license to serve as the administrator of an assisted living facility, and the burdening of her future employment prospects.

### a.  The Loss of the IA Job

We observed in Pendleton v. City of Haverhill that, "to achieve a sufficient 'plus' in a loss-of-job context, words spoken must be uttered incident to the termination." 156 F.3d 57, 63 (1st Cir. 1998) (internal quotation marks omitted). The plaintiff in that case was discharged from his position with a non-profit organization after a police officer made disparaging comments about him in a local newspaper article in connection with drug charges that had been dismissed. See id. at 61-62. We held that the plaintiff did not have a valid "plus" because "the alleged defamation and the decision to cashier [the plaintiff] came from two separate, unrelated sources, and the former [could not] plausibly be said to have occurred incident to the latter." Id. at 63 (internal quotation marks omitted). That reasoning applies here. The alleged defamation and the decision to fire Mead came from two distinct sources.

Mead argues that, despite this reasoning in Pendleton, the case is not as hostile to her claim as it might seem. It is true that a footnote in Pendleton faulted the plaintiff for

-11-

"rely[ing] on sheer speculation and fail[ing] to establish any tangible connection between [the police officer's] statements and his ouster at the hands of [his employer's] president." Id. at 63 n.3. Perhaps with this footnote in mind (Mead does not invoke it explicitly), Mead presses for the application here of a proximate cause analysis derived from tort law. She contends that it is sufficient for her stigma plus claim if her termination by IA was a reasonably foreseeable consequence of her defamation by the DHHS employees.

This contention finds some support in cases from other circuits. See Paige v. Coyner, 614 F.3d 273, 280 (6th Cir. 2010) ("[O]nce there has been state action . . ., the proper test for the scope of responsibility for events flowing from that action is reasonable foreseeability, not how close the nexus is between the private actors and the state actors."); Velez v. Levy, 401 F.3d 75, 89 (2d Cir. 2005) ("There is no rigid requirement . . . that both the 'stigma' and the 'plus' must issue from the same government actor or at the same time.").

Whatever hope Mead might find in Pendleton and these cases for her proximate cause argument, it is foreclosed by a more recent case of ours. See URI, 631 F.3d at 10 ("The standard requires that the change in rights or status be directly attributable to the challenged governmental action. Where the stigma and the incremental harm - the 'plus' factor - derive from

-12-

distinct sources, a party cannot make out a viable procedural due process claim." (internal citation omitted)).

Moreover, the "plus" in this case cannot be the loss of Mead's IA job with a private employer. As an alternate ground for our holding in Pendleton, we noted that the plaintiff "worked for a non-governmental employer and lost a private (not a public) position." 156 F.3d at 63. We added that "a violation of constitutional proportions under a stigma plus theory exists only if, and to the extent that, the opportunities lost are government benefices denied as a result of government action." Id. (emphasis added) (internal quotation marks omitted). Although it is regulated by, and receives funding from, DHHS, IA is a private employer. Nothing in the complaint suggests otherwise. As such, Mead's job there was not a government benefice.[2]

### b. The Loss of a De Facto License

The "plus" in this case also cannot be the loss of Mead's de facto license to serve as the administrator of an assisted living facility. Some circuits have observed that, when a government body controls entry into a profession through means

_____

[2] We are not swayed by Mead's citation to Wroblewski v. City of Washburn, in which the Seventh Circuit suggested that the loss of private employment could be the "plus" in a stigma plus case, see 965 F.2d 452, 456 (7th Cir. 1992), because Pendleton is clearly to the contrary. Of course, a plaintiff who has been discharged from a non-government job as a result of government action still may assert unreasonable government interference with private employment, even if he or she is foreclosed from proceeding under a stigma plus theory.

short of the issuance of a formal license, a de facto licensing scheme may exist. For example, in Philips v. Vandygriff, the Fifth Circuit held that such a scheme existed in Texas because, by industry custom, individual savings and loan associations would not hire managerial employees without the approval of the Commissioner of the Texas Savings and Loan Department. See 711 F.2d 1217, 1222 (5th Cir. 1983); see also Bannum, Inc. v. Town of Ashland, 922 F.2d 197, 201 (4th Cir. 1990) ("[The government's] power to withhold its approval . . . is equivalent to a power to withhold a business opportunity and amounts to a de facto licensing power").

If we were to follow these circuits, there might be some force to Mead's argument that a de facto license is a government benefice. In turn, the revocation of a de facto license, like the loss of a government job, might be a valid "plus" insofar as it effects "a change in the injured person's status or rights under substantive state or federal law." Silva, 130 F.3d at 32. That is essentially the conclusion reached by the Sixth Circuit in Mertik v. Blalock, albeit without reference to the de facto license terminology preferred by Mead. See 983 F.2d 1353, 1363 (6th Cir. 1993) (holding that the "plus" could be based on city's revocation of instructor's permission to use public ice skating rink for private lessons).

We need not decide whether to follow these circuits, however, because the complaint in this case does not allege that

any de facto license was ever taken from Mead by DHHS. Mead's appellate briefing asserts that she "lost her status as a DHHS approved administrator of a licensed assisted living facility" and that "[t]his status is the functional equivalent of a license because . . . Mead cannot be an administrator of a licensed assisted residential care facility without this status." That assertion, though, is belied by the allegations in the complaint. The complaint alleges only that DHHS barred Mead from working as the administrator of Goldeneye, not that DHHS excluded Mead from other assisted living facilities. Indeed, the complaint makes clear that DHHS permitted Mead to remain in her position as the administrator of IA's fourteen other facilities, which is inconsistent with the notion advanced in Mead's briefing that DHHS revoked any de facto license. As we have already explained, IA deprived Mead of her position as an administrator of licensed assisted living facilities, not DHHS.

### c. The Burdening of Employment Prospects

Nor can Mead's "plus" be the imposition of tangible burdens on her future employment prospects. In <u>Siegert</u> v. <u>Gilley</u>, the Supreme Court reiterated that neither reputational harm nor the consequent impairment of future employment opportunities are constitutionally cognizable injuries. 500 U.S. 226, 233-34 (1991) (citing <u>Paul</u>, 424 U.S. at 708-09). There, a clinical psychologist voluntarily resigned from his position at a federal hospital in

-15-

order to avoid being fired. See id. at 227-228. Three weeks later, his former supervisor wrote him an extremely negative reference letter, which had the effect of foreclosing clinical positions at other government hospitals. See id. at 228-29. The psychologist brought suit under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), asserting a stigma plus claim. See Siegert, 500 U.S. at 229. In concluding that the psychologist had not adequately alleged the deprivation of a protected liberty interest, the Supreme Court explained that "[t]he statements contained in the letter would undoubtedly damage the reputation of one in his position, and impair his future employment prospects[,] . . . [b]ut so long as such damage flows from injury caused by the defendant to a plaintiff's reputation, it may be recoverable under state tort law but it is not recoverable in a Bivens action." Id. at 234.

The instant case is indistinguishable. Mead's complaint alleges that the stigmatizing effect of the DHHS Statement has "rendered it virtually, if not literally, impossible for [her] to ever be employed as an administrator of an assisted living facility." The complaint further alleges that Mead's "negative record with DHHS" has diminished her attractiveness to potential employers who are regulated by DHHS and who must submit candidates for employment to DHHS for approval. These allegations, like the allegations in Siegert, concern only those damages to employment

-16-

prospects that predictably "flow from" reputational injury. Id. In these circumstances, "Siegert stands for the proposition that . . . impairment of future employment prospects does not constitute a constitutional deprivation." Pendleton, 156 F.3d at 63 n.4 (internal quotation marks omitted); see also Vander Zee v. Reno, 73 F.3d 1365, 1369-70 (5th Cir. 1996).

We recognize that, in different circumstances, some circuits have held that the burdening of a plaintiff's future employment prospects might constitute a valid "plus." In Valmonte v. Bane, for example, the Second Circuit held that the plaintiff, a former childcare worker, had been stigmatized by the inclusion of her name on a state registry of child abusers, and that the "plus" was a statutory requirement that potential employers consult the registry before making any hires and explain in writing the decision to employ anyone on the registry. See 18 F.3d 992, 1001-02 (2d Cir. 1994). The court explained:

> This is not just the intangible deleterious effect that flows from a bad reputation. Rather, it is a specific deprivation of her opportunity to seek employment caused by a statutory impediment established by the state. [The plaintiff] is not going to be refused employment because of her reputation; she will be refused employment simply because her inclusion on the list results in an added burden on employers who will therefore be reluctant to hire her.

Id. at 1001; see also Doyle v. Camelot Care Ctrs., Inc., 305 F.3d 603, 617 (7th Cir. 2002). Similarly, some circuits have held that

a statutory impediment to a plaintiff's prospective ability to obtain government benefits might be a "plus." For example, in Humphries v. County of Los Angeles, the Ninth Circuit held that parents who had been stigmatized by their erroneous addition to a state database of suspected child abusers had a valid "plus" because state agencies were required by law to check the database and investigate anyone appearing on it before conferring benefits or granting certain licenses. See 554 F.3d 1170, 1187-92 (9th Cir. 2009), rev'd on other grounds, 131 S. Ct. 447 (2010).

The allegations in this case do not require us to address the very different circumstance in which a plaintiff's prospects have been impaired by operation of law in the wake of stigma attributable to the government. To the extent that Mead's career opportunities have been dimmed, the damage is solely the result of harm to her reputation, not some statutory impediment or other legal obstacle to her employment. Hence, she has no viable stigma plus claim on the basis of a burdening of employment prospects. See Siegert, 500 U.S. at 234.

In sum, Mead has not alleged that the DHHS employees deprived her of any protected liberty interest.[3] As a result, they

---

[3] In light of this conclusion, we have no reason to consider the DHHS employees' qualified immunity defense. See Redondo-Borges v. U.S. Dep't of Hous. & Urban Dev., 421 F.3d 1, 11 (1st Cir. 2005).

were not constitutionally required to provide her with a name-clearing hearing or other form of process.[4]

Affirmed.

_____

[4] After dismissing Mead's federal claims, the district court explained its decision not to exercise supplemental jurisdiction over the state law claims. Mead says she is challenging all the rulings of the district court, including this one. Nevertheless, there is no argument in her briefing that the refusal to exercise supplemental jurisdiction after the dismissal of the federal claims was an abuse of discretion. In any event, that decision was well within the discretion of the district court.