Faigin v. Kelly                    CV-95-317-SD 10/01/97   P

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**


A.J. Faigin

         v.                              Civil No. 95-317-SD

James E. Kelly;
Vic Carucci


## O R D E R

In this diversity action, plaintiff A.J. Faigin, a sports agent, asserts that he was defamed by statements appearing in an autobiography co-authored by defendants James E. Kelly, a former professional football player, and Vic Carucci, a sportswriter. Presently before the court is defendants' motion for summary judgment, to which plaintiff objects.


## Background

In 1992, defendant Jim Kelly, former quarterback for the Buffalo Bills football team, published his autobiography, Armed and Dangerous, which was co-authored by defendant Vic Carucci, a sports writer for the Buffalo News. The autobiography contains approximately five or six references to plaintiff A.J. Faigin, who served as one of Kelly's agents from 1983 to 1987. Essentially, those references charge Faigin with untrustworthy

conduct in his representation of Kelly and form the basis for Faigin's cause of action for defamation against Kelly and Carucci.

Faigin co-founded several corporations ("Lustig companies") with Mr. Greg Lustig and Mr. Kenneth Weinberger. Defendants' Reply Memorandum at 12; Plaintiff's Exhibit 22. The Lustig companies offered athletes a range of services and consisted of four companies: (1) Lustig Pro Sports (LPS), which provided Kelly with agency services; (2) Consultants Development Group (CDG), which provided Kelly with financial and investment services; (3) Lustig & Faigin Co. L.P.A., a law firm; and (4) Lustig Group. Defendants' Memorandum at 8. Faigin's role in the various Lustig companies is disputed. Although Faigin held the title of President of LPS, he maintains that he performed mainly as a contract negotiator for LPS and that his title was merely cosmetic for recruitment purposes. However, it is undisputed that Lustig was the dominant figure of the Lustig companies and controlled most of the financial and investment services provided through CDG.

In 1983, while still a college student, Kelly hired Faigin and Lustig as his agents and attorneys. Faigin and Lustig negotiated Kelly's first professional football contract with the now-defunct United States Football League team the Houston

2

Gamblers.  In 1986 Faigin and Lustig negotiated Kelly's contract with the Buffalo Bills, creating the highest-paying contract in National Football League (NFL) history to that date.[1]

In 1987, Faigin ended his association with Lustig and the Lustig companies to embark on his own sports agency business. Faigin was unable to meet with Kelly to discuss his decision to leave, so he sent Kelly a cassette tape in which he described the reasons behind his split with Lustig, including his knowledge of Lustig's having double-billed clients.  Faigin did, however, remain a shareholder in the various Lustig companies until at least 1991. Defendants' Reply Memorandum at 10.

At about this time, Kelly's brother and two friends began noticing some "problems" concerning the business services provided by the Lustig companies.  Defendants' Memorandum at 10. These problems, as described by Kelly, consisted of double-billing him, obtaining a worthless disability insurance policy for him, investing his money in inappropriate or fraudulent investments, unwisely structuring his contract with the Houston Gamblers, and obtaining a two-year prepayment for services in violation of NFL Players Association regulations.  As a result,

---

[1]  In the book, Kelly's references to Faigin's contract negotiations on his behalf seem appreciative of Faigin's efforts and, as argued by Kelly, "enhance Faigin's reputation as a tough negotiator."  Defendants' Memorandum at 31.

Kelly formally fired Lustig in 1988 and terminated his business with the Lustig companies. Kelly took no formal action with regard to firing Faigin.

In 1989 Kelly filed suit against Lustig, Faigin, Kenneth Weinberger, and others in the United States District Court for the Southern District of Texas claiming, among other things, breach of fiduciary duties owed by agents to their clients. Part of this suit was settled in arbitration, which led to Kelly's receiving $700,000 from two brokerage firms for improper investments. Kelly voluntarily dismissed his action in 1994 at the prodding of the court due to Lustig's personal bankruptcy and the belief that the Lustig companies had no financial resources. See Kelly v. Lustig, No. H-89-1931, slip op. at 2 (S.D. Tex. 1994). Upon dismissal of this suit, Faigin filed for Rule 11 sanctions against Kelly. The district court awarded Faigin $11,000, sanctioning Kelly for bringing a frivolous lawsuit against Faigin. Kelly's suit had focused on the issue of improper investments and, since "Kelly's deposition clearly states his belief that Faigin was responsible solely for the player contract work, not for any investments," the court concluded that this and "other evidence . . . suggests that Faigin was not involved in these decisions and that Kelly was aware of this lack of involvement. Id. at 4.

4

Faigin filed the present action against Kelly and Carucci as co-authors of Kelly's autobiography, <u>Armed and Dangerous</u>, for the allegedly defamatory passages against Faigin.

Discussion

1. <u>Summary Judgment Standard</u>

It is appropriate to grant summary judgment when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. <u>See</u> Rule 56(c), Fed. R. Civ. P.; <u>Lehman v. Prudential Ins. Co. of Am.</u>, 74 F.3d 323, 327 (1st Cir. 1996). The court's function at this stage is to weigh the evidence and determine, not the truth of the matter, but whether there is a genuine issue for trial. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). To establish a trial-worthy issue, it does not suffice to rest upon mere allegations or denials of the adverse party's pleadings. <u>See</u> <u>id.</u> at 256. Rather, there must be enough competent evidence to allow a trier of fact to find in favor of the non-moving party. <u>See</u> <u>id.</u> at 249. When the non-moving party bears the burden of persuasion at trial, to avoid summary judgment that party must make a "showing sufficient to establish the existence of [the] element[s] essential to [his] case." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). In ruling on summary judgment, the court

5

construes the evidence and draws all justifiable inferences in the non-moving party's favor. See Anderson, supra, 477 U.S. at 255.


## 2. Defamatory Meaning

Faigin claims that the following passage from Kelly's autobiography constitutes defamation by imputing untrustworthy conduct to Faigin.

> I learned my lesson the hard way about whom to trust and whom not to trust in business. I had had complete faith in my first agents, Greg Lustig and A.J. Faigin. Before signing with them out of college, I talked to a bunch of other players they represented and they all said Lustig and Faigin did a good job on their contracts. Even Jack Lambert, the former Steeler great, gave them a strong recommendation.
> Then Danny and the Trevino brothers started taking a closer look at my business affairs. And the more they looked, the more they didn't like what they found.
> Finally, I saw the light. In 1988, I fired Lustig and Faigin and put my brother and the Trevinos in charge of all my business dealings. Then I filed a major lawsuit against my former agents, as well as the former owners of the Gamblers for defaulting on the payment of my signing bonus.
> Fortunately, I was able to catch the problem before it was too late, which made me luckier than a lot of other pro athletes. When you come out of college, you're so trusting, so vulnerable when it comes to finding people to handle your money. I'm just glad that I had a brother and a couple of close friends who cared enough to slap me upside the head and get my attention.
> The funny thing is, my mother never liked Lustig from Day One. There was something about him that

6

> told her he couldn't be trusted.
> I should have followed Mom's intuition.

Armed & Dangerous at 159-60.

To establish defamation, a plaintiff must show that the "defendant failed to exercise reasonable care in publishing, without a valid privilege, a false and defamatory statement of fact about the plaintiff to a third party." Independent Mechanical Contractors, Inc. v. Gordon T. Burke & Sons, Inc., 138 N.H. 110, 118, 635 A.2d 487, 492 (1993) (citing RESTATEMENT (SECOND) OF TORTS § 558 (1977); 8 Richard B. McNamara, New Hampshire Practice, Personal Injury, Tort and Insurance Practice § 2 (1988)). A given statement is defamatory if "it tends to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." RESTATEMENT, supra, § 559.

Defendant Kelly argues that the above-quoted passages from his autobiography do not contain false statements of fact concerning plaintiff Faigin, but rather merely espouse Kelly's subjective opinion, which is incapable of verification as true or false. Thus Kelly concludes that the First Amendment shields him from liability for defamation. Constitutional protection for expressions of opinion was established when the Supreme Court announced that "[u]nder the First Amendment there is no such thing as a false idea." Gertz v. Robert Welch, Inc., 418 U.S.

7

323, 339 (1974). However, subsequent caselaw has rejected the view that "'Gertz was intended to create a wholesale defamation exemption for anything that might be labeled opinion.'" Godfrey v. Perkin-Elmer Corp., 794 F. Supp. 1179, 1191 (D.N.H. 1992) (citing Milkovich v. Lorain Journal Co., 497 U.S. 1, 21 (1990)). Rather, the Court in Milkovich rejected an "artificial dichotomy between 'opinion' and fact," Milkovich, supra, 497 U.S. at 19, because expressions of "opinion" may nonetheless imply an underlying objective evaluation that is "susceptible of being proved true or false." Id. at 21.

The question of whether an expression of opinion nonetheless implies an underlying objective evaluation of the defamed subject is, in the first instance, a question of law for the court. See White v. Fraternal Order of Police, 909 F.2d 512, 518 (D.C. Cir. 1990). Summary judgment on the ground of constitutional privilege is only appropriate if no reasonable person could conclude that the communication implies a defamatory statement of fact.

This court agrees with Kelly that the first paragraph's opening sentence, "I learned my lesson the hard way about whom to trust and whom not to trust in business," merely expresses Kelly's subjective evaluation of Faigin. Criteria of trustworthiness may vary from person to person, and, standing

8

alone, the statement does not appeal to any objective criteria beyond that held by Kelly. However, the second paragraph does imply an objective, factual basis for Kelly's evaluation that Faigin is untrustworthy. The text reads, "the more [Danny and the Trevino brothers] looked [at my business affairs], the more they didn't like what they found." This implies that Danny and the Trevinos discovered some concrete evidence of Faigin's untrustworthy conduct in handling Kelly's business affairs. This is an assertion of fact that is susceptible of being proved true or false.

The third paragraph removes all doubt that the evaluation "Faigin is untrustworthy" was meant as an objective matter of fact. The paragraph begins, "Finally, I saw the light," which implies recognition of some alleged truth about Faigin, not formulation of a subjective opinion. Continuing, the paragraph asserts that Kelly fired Faigin and instituted a "major lawsuit" against him, insinuating that Faigin engaged in untrustworthy misconduct to justify such adverse actions against him. Furthermore, the claim that Kelly filed a "major lawsuit" against Faigin appeals to the objective criteria of the law as a basis for the evaluation that "Faigin is untrustworthy." Read as a whole, the passage from the autobiography clearly implies factual allegations that are susceptible of being proved true or false.

This is not "the sort of loose, figurative, of hyperbolic language," Milkovich, supra, 497 U.S. at 21, that merely expresses Kelly's opinion of Faigin and is constitutionally protected.

Next, Kelly seeks summary judgment on the ground that the passages from the book were true. "One who publishes a defamatory statement of fact is not subject to liability for defamation if the statement is true." RESTATEMENT, supra, § 581A. In the law of defamation, truth is defined as "substantial truth," as it is not necessary that every detail be accurate. See Curley v. Curtis Pub. Co., 48 F. Supp. 29, 33 (D. Mass. 1942). In other words, literal truth of a statement is not required "'so long as the imputation is substantially true so as to justify the "gist" or "sting" of the remark.'" Maheu v. Hughes Tool Co., 569 F.2d 459, 466 (9th Cir. 1977) (citation omitted). Furthermore, a false and "defamatory inference may be derived from a factually accurate news report." Southern Air Transport v. ABC, 877 F.2d 1010, 1014 (D.C. Cir. 1989); see also White, supra, 909 F.2d at 521 (holding that factually accurate report that plaintiff failed drug test supported false and defamatory inference that plaintiff used illegal drugs); Davis v. Ross, 754 F.2d 80, 84 (2d Cir. 1985) (holding that a factually accurate report that an employee was discharged may nonetheless

10

constitute actionable defamation if the report "contains an insinuation that the discharge was for some misconduct"). It is irrelevant that the passage may in some respects be a facially accurate report that Kelly did in fact fire and sue Faigin because the focus is whether the underlying defamatory inference is true or false.

This court finds that there remains a disputed issue of fact whether the "sting" of the defamatory passages from Kelly's book --that Faigin engaged in untrustworthy and unlawful conduct in handling Kelly's business affairs--is substantially true. Kelly alleges that Faigin committed several untrustworthy acts constituting unlawful breach of fiduciary duties in handling Kelly's business affairs. See Kelly's Memorandum of Law at 36. However, in 1994 Kelly made the same factual allegations to support a lawsuit against Faigin in the United States District Court for the Southern District of Texas. The Texas court determined that Kelly's allegations against Faigin were frivolous and imposed Rule 11 sanctions on Kelly. This is persuasive evidence that Kelly's allegations against Faigin asserted in support of the "sting" of the defamation are false.[2]

_____

2  The parties dispute whether the Texas court's Rule 11 sanctions order should have preclusive effect in this action under the doctrine of collateral estoppel. However, since the motion for summary judgment before the court was filed by defendant Kelly, the court need only decide whether there is a

11

### 3. Limited-Purpose Public Figure

Kelly next argues that summary judgment should be granted because Faigin qualifies as a "public figure." Under the First Amendment, state tort law may not as vigorously protect a "public figure's" interest in reputation. The First Amendment protects citizens from liability for defamation of public figures unless the erroneous statement was made with "actual malice." See Curtis Pub. Co. v. Butts, 388 U.S. 130, 155 (1967). The rationale for applying a heightened constitutional standard to defamation of public figures is threefold. First, the standard strikes the most appropriate balance between the state's interest in protecting reputation and the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open . . . ." New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964). Although calculated falsehoods remain outside the core of the First Amendment, erroneous misstatements are inevitable in a robust system of free expression. Second, public figures assume the risk of defamatory statements leveled against them because by "thrust[ing] themselves to the forefront

---

disputed issue of fact about the truth of the defamation. To decide this, the court need not determine whether the Texas court's Rule 11 sanctions order has preclusive effect. In other words, Faigin is attempting to use the doctrine of collateral estoppel offensively, which is inappropriate when defending against a motion for summary judgment filed by the opposing party.

of particular public controversies . . . they invite attention and comment." <u>Gertz</u>, <u>supra</u>, 418 U.S. at 345. Lastly, public figures more readily may resort to self help, minimizing the need for judicial protection against defamation. "Public . . . figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." <u>Id.</u> at 344.

The designation "public figure" may rest on two alternative bases. First, in some instances, an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. <u>Id.</u> at 351-52. Second, persons of lesser fame may nonetheless qualify as limited public figures if they "thrust themselves to the forefront of particular public controversies." <u>Id.</u> at 345. Such limited public figures are subject to the "actual malice" standard only for defamation arising out of the public controversy into which they have thrust themselves. W.P. KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 113, at 806 (5th ed. 1984); <u>see</u> <u>Bruno & Stillman, Inc. v. Globe Newspaper Co.</u>, 633 F.2d 583, 591-92 (1st Cir. 1980); <u>Dameron v. Washington Magazine, Inc.</u>, 779 F.2d 736, 741 (D.C. Cir. 1985); <u>Waldbaum v. Fairchild Publications, Inc.</u>, 627 F.2d 1287, 1296-98 (D.C. Cir. 1980); <u>cf.</u> <u>Woy v. Turner</u>, 573 F. Supp. 35, 38 (N.D.

13

Ga. 1983). Kelly makes the more modest contention that Faigin was a limited-purpose public figure.

According to Kelly, Faigin voluntarily injected himself into the forefront of the public controversy surrounding the unscrupulous and untrustworthy practices of sports agents who represent professional athletes. In Time v. Firestone, 424 U.S. 448, 454 (1976), the Court drew a distinction between "public controversy," on the one hand, and "controversies of interest to the public," on the other. In that case, Mary Firestone, a wealthy socialite, brought a defamation action against Time, Inc., for erroneously reporting that her husband, well-known industrialist Russell Firestone, had been granted a divorce on grounds of extreme cruelty and adultery, when the grounds were actually "lack of domestication." The Firestones' divorce proceedings had captured wide-spread public attention due not only to the Firestones' notoriety as members of the "sporting set," but also to the sensational nature of the charges leveled against Mary by her husband Russell. The Court concluded that, "even though the marital difficulties of extremely wealthy individuals may be of some interest to some portions of the reading public," id. at 454, the affair was not a "public controversy." The Court did not elaborate further, nor did it articulate any standards governing when a controversy may be

14

properly characterized a "public controversy."

However, standardless decisionmaking with respect to this constitutional issue is fraught with danger of government censorship, because, as the Court pointed out in <u>Gertz</u>,

> it would occasion the . . . difficulty of forcing state and federal judges to decide on an *ad hoc* basis which publications address issues of "general or public interest" and which do not--to determine, in the words of Mr. Justice Marshall, "what information is relevant to self-government." <u>Rosenbloom v. Metromedia, Inc.</u>, 403 U.S. [29,] 79 [(1971)]. We doubt the wisdom of committing this task to the conscience of judges.

<u>Gertz</u>, <u>supra</u>, 418 U.S. at 346. True commitment to freedom of expression precludes the government from supervising which issues are open for public debate.

Since <u>Firestone</u>, courts have struggled to articulate more determinate standards distinguishing between "public controvers[ies]" and "controversies of interest to the public." <u>See, e.g.</u>, <u>Avins v. White</u>, 627 F.2d 637, 647 (3d Cir. 1980); <u>Waldbaum</u>, <u>supra</u>, 627 F.2d at 1296; <u>Bose Corp. v. Consumers Union of U.S., Inc.</u>, 508 F. Supp. 1249, 1273 (D. Mass. 1981); <u>Fitzgerald v. Penthouse Int'l, Ltd.</u>, 525 F. Supp. 585, 590 (D. Md. 1981). The generally accepted test first enunciated by the District of Columbia Circuit in <u>Waldbaum</u> examines whether "the outcome of [the controversy] affects the general public or some segment of it in an appreciable way." <u>Waldbaum</u>, <u>supra</u>, 627 F.2d

15

at 1296.  However, this test does not render resolution of the "public controversy" issue any more determinant, but merely shifts standardless decisionmaking to a different part of the analysis.  An *ad hoc* inquiry into whether the effect of a controversy on the public is "appreciable," or worthy of judicial recognition, turns courts into censors of public debate no less so than an *ad hoc* inquiry into "which publications address issues of public interest," Gertz, supra, 418 U.S. at 346.  Under either inquiry, the reviewing court must make *ad hoc* content-based assessments of the relative worth of the issues involved in the controversy.

Rather, this court believes that controversies of interest to the public should be considered prima facie "public controversies," unless the matter falls within a recognized sphere of privacy protecting the participants from intrusive and potentially harmful media attention.  In identifying such privacy interests, courts should look to our nation's history, legal traditions, and practices which "provide the crucial 'guideposts for responsible decisionmaking' that direct and restrain our exposition of the [Constitution]."  Washington v. Glucksberg, ___ U.S. ___, ___, 117 S. Ct. 2258, 2268 (1997) (quoting Collins v. Harker Heights, 503 U.S. 115, 125 (1992)).  For instance, citizens enjoy a recognized privacy interest in their marriage,

16

divorce, and other family planning matters, so the Court in Firestone was justified in refusing to find the Firestones' divorce proceedings a "public controversy," even though it captured public interest.

Accordingly, this court finds there was a "public controversy" surrounding sports agents' representations of professional athletes.  As the plaintiff points out, the untrustworthiness of sports agents "has received widespread attention in every medium, ranging from law review articles to the current blockbuster film 'Jerry Maguire.'"  Defendant's Memo at 40.  The articles and coverage cited by plaintiff evidence that the controversy captured public interest raising a presumption of "public controversy."  This presumption is not overcome because there are no recognized privacy interests at stake in the relation between sports agents and the professional athletes they represent, as there are, for instance, between doctors and their patients or lawyers and their clients.  Furthermore, any privacy interests that do arise are those of the athlete, not the agent.

Having found that a "public controversy" existed, the next step is to examine Faigin's role in that controversy.  Public figures are those who "have 'thrust themselves to the forefront' of the controversies so as to become factors in their ultimate

17

resolution." Waldbaum, supra, 627 F.2d at 1297 (quoting Gertz, supra, 418 U.S. at 345). Language from some of the cases appears to indicate that plaintiffs must seek "to influence the resolution of the controversy." Fitzgerald, supra, 525 F. Supp. at 592; see also Lerman v. Flynt Distrib. Co., 745 F.2d 123, 316 (2d Cir. 1984) (plaintiff must have "successfully invited public attention to his views in an effort to influence others"), cert. denied, 471 U.S. 1054 (1985). Under this understanding, plaintiffs thrust themselves to the forefront of a controversy only by publicly assuming an ideological position in an ensuing public debate. On the other hand, some courts find public figure status if the plaintiff voluntarily enters a sphere of public concern out of which the public debate arises, even though the plaintiff does not publicly assume an ideological position in the resulting debate. See, e.g., Brewer v. Memphis Publishing Co., 626 F.2d 1238 (5th Cir. 1980), cert. denied, 452 U.S. 962 (1981); Chuy v. Philadelphia Eagles Football Club, 595 F.2d 1265, 1280 (3d Cir. 1979); Cepeda v. Cowles Magazines, 392 F.2d 417 (9th Cir. 1968); Curtis Publishing Co. v. Butts, supra, 388 U.S. 155. The latter is the better position because, as long as the plaintiff voluntarily engages in activity out of which publicity and controversy foreseeably arise, the threefold rationale for public figure status is applicable, regardless of whether the

18

plaintiff further assumes an influencing role in the controversy.

Concededly, Faigin publicly assumed no ideological position in the controversy surrounding sports agents' unscrupulous representation of athletes. While he did contact state and federal legislators with regard to proposed legislation regulating agents, Defendants' Memo, Exhibit 70; see Defendants' Memo, Exhibit 44, Faigin Deposition at 682-85, 689-91, this contact constituted "behind the scenes" influencing.

Nonetheless, this court finds that Faigin voluntarily thrust himself to the forefront of the public controversy. First, Faigin himself claims that he was a "prominent agent in the mid 1980s." Faigin Deposition, supra, at 117. Also, Faigin admits that he often had contact with the press regarding the athletes he was representing, id. at 634, was often quoted in published articles, id. at 636, and periodically appeared on sports talk shows on radio and television, id. at 643. His own promotional materials identify him as "a nationally known sports agent," Defendant's Memo, Exhibit 68, and boast that "[t]here has not been a significant trend in the negotiation of football contracts or tactics that I have not helped in creating or taken a lead role in implementing." Defendant's Motion, Exhibit 77, "A.J. Faigin['s] Qualifications to Represent a Top NFL Draft Pick." Further, Faigin achieved the position as a high-profile sports

19

agent largely through self-promotion. He voluntarily thrust himself to the forefront of a high-profile community of sports agents that attracted media attention and publicity. Faigin may not now hide behind a cloak of privacy when the publicity turns negative.

Since Faigin is a public figure, he is obligated to prove that Kelly and Carucci acted with actual malice in publishing the defamatory passages of the autobiography. The "actual malice" standard, as established in New York Times Co., supra, 376 U.S. at 279-80, requires a showing that the defendant published the defamatory falsehood with "knowledge that it was false or with reckless disregard of whether it was false or not." Here, there is enough evidence on the record for a reasonable juror to find that Kelly knew the defamatory statements about Faigin were false. In the Rule 11 sanctions order, the Texas court found that "Kelly knew that the allegations against Faigin were frivolous, but he continued to consent to this being included in the suit." Plaintiff's Memorandum, Exhibit 65, at 4. Also, Kelly admitted in deposition testimony that Faigin did most of the "contract negotiation work" and Faigin's partner Greg Lustig handled Kelly's financial affairs. This is evidence that Kelly knew Faigin had not committed untrustworthy conduct in handling his business affairs. At this stage of the litigation, Faigin

has met his burden of proving actual malice on the part of Kelly.

However, there is no evidence that Carucci, Kelly's co-author, knew the allegations against Faigin were false or recklessly disregarded the truth. It is undisputed that Carucci, who was a reporter and casual friend of Kelly's, had no personal knowledge of whether Faigin engaged in untrustworthy conduct in handling Kelly's business affairs. Rather, Carucci relied solely on Kelly to recount the facts surrounding Faigin's representation of Kelly. There is no evidence that Kelly told Carucci that the allegations against Faigin were false. Further, there is nothing in the record to suggest that Carucci's reliance on Kelly was misplaced and reckless, such as evidence that Kelly was known to be an unreliable source of truthful information. Also, since Kelly's name was on the autobiography, Kelly was placing himself in danger of liability for any defamatory falsehoods, which is a recognized indicator of reliability. St. Amant v. Thompson, 389 U.S. 727, 733 (1968). Plaintiff relies solely on the opinion of an expert that Carucci failed to follow reasonable journalistic standards in not contacting Faigin to confirm the defamatory imputation. However, failure to follow journalistic standards and lack of investigation may establish irresponsibility or even possibly gross irresponsibility, but not reckless disregard of truth.

21

## 5. Plaintiff's Injury

Defendants finally argue that their motion for summary judgment should be granted because Faigin cannot show proof of damages resulting from the defamation. However, "[a] person may be held liable for defamation without proof of special harm if the publication imputes . . . matter incompatible with the plaintiff's business, trade, profession, or office . . . ." RESTATEMENT, supra, § 570. Also, under New Hampshire law, "[q]uestions of whether plaintiff has, in fact, sustained an injury or any damage, and, if he has, the nature and extent [thereof], are . . . questions of fact for determination by the jury or other trier of facts." Thomson v. Cash, 119 N.H. 371, 376, 402 A.2d 651, 654-55 (1979) (citations omitted); see also Chaulk Services, Inc. v. Fraser, 769 F. Supp. 37, 40 n.5 (D.N.H. 1990). Therefore, the issue of Faigin's damages is a question of fact for a jury.

## 6. Conclusion

For the foregoing reasons, defendants' motion for summary judgment is denied.

**SO ORDERED.**

_____
Shane Devine, Senior Judge
United States District Court

October 1, 1997

22

cc:    Wilbur A. Glahn III, Esq.
       Alan J. Mandel, Esq.
       Linda Steinman, Esq.
       William L. Chapman, Esq.