Robert NORRIS, Plaintiff,

v.

BANGOR PUBLISHING CO., et al., Defendants.

No. Civ. 98–207–B.

United States District Court, D. Maine.

June 11, 1999.

Thomas R. Watson, McTeague, Higbee, Macadam, Case, Watson & Cohen, Topsham, ME, for plaintiff.

Bernard J. Kubetz, Eaton, Peabody, Bradford & Veague, Bangor, ME, for defendant.

## ORDER AND MEMORANDUM OF DECISION

BRODY, District Judge.

Plaintiff Robert Norris ("Plaintiff") has filed a Complaint against Defendants Bangor Publishing Co. ("BPC") and John Day ("Day"), alleging that he was defamed in a series of three articles written by Day and published by BPC. Plaintiff contends that he was defamed in an October 12, 1996 article (Count I), in an October 15, 1996 article (Count III), and in an October 19, 1996 article (Count II), all published in the *Bangor Daily News*. He also contends that Day's defamatory actions were taken within the scope of his employment and that therefore BPC is liable for Counts I–III under a theory of respondeat superior (Count IV). Plaintiff additionally asserts that BPC and Day subjected him to negligent or intentional infliction of emotional distress (Count V) and committed tortious interference with existing and prospective business advantage (Count VI). Before the Court is BPC and Day's Motion for Summary Judgment on all Counts of Plaintiff's Complaint. For the reasons discussed below, BPC and Day's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

## I. MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate in the absence of a genuine issue as to any material fact and when the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). An issue is genuine for these purposes if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248,

106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact is one that has "the potential to affect the outcome of the suit under the applicable law." *Nereida–Gonzalez v. Tirado–Delgado*, 990 F.2d 701, 703 (1st Cir. 1993). Facts may be drawn from "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." Fed.R.Civ.P. 56(c). For the purposes of summary judgment the Court views the record in the light most favorable to the nonmoving party. *See McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995).

## II. BACKGROUND

Plaintiff is a non-practicing lawyer and political consultant who works in Washington, D.C. He has worked in connection with hundreds of political campaigns, conducting research into the backgrounds of Republican candidates in targeted national races on behalf of Democratic Party organizations, Democratic candidates, and causes endorsed by Democratic organizations. He did this work first as an employee of the Democratic Congressional Campaign Committee ("DCCC"), where he became the senior person in charge of "opposition research." In 1991, Plaintiff left the DCCC to run his own consulting firm, NK Associates, which advertised itself in a leading industry publication as an "opposition research" firm. In 1994, NK Associates dissolved and Plaintiff became the sole proprietor of a new political consulting firm, Commonwealth Consultants. Plaintiff has spoken at at least seventeen seminars and conventions on the issues of political campaigns and opposition research. In addition, he was mentioned in a July 2, 1992 *Washington Post* article about opposition research, and was quoted in a November 20, 1994 *Baltimore Sun* article on the topic of former Speaker of the House Newt Gingrich.

While the appropriate definition of "opposition research" is in dispute, at a minimum, it involves the examination of public

records relating to a political candidate by persons hired expressly for this purpose by a party opposed to that candidate. As an opposition researcher, Plaintiff engages in such activities as checking newspaper articles, court records, real estate records, probate records, and high school and college records, and researching the personal histories of family members. He then prepares a written report on the results of his research for the client.

Three preliminary events deserve note before sketching the specific events giving rise to this suit. First, in 1992, Plaintiff drafted an article on opposition research and submitted it for publication to *Campaigns & Elections* magazine. *Campaigns & Elections* published Plaintiff's article in its September 1992 volume, but did so in altered form without Plaintiff's permission. Plaintiff wrote a Letter to the Editor protesting the alteration. In it, he explained that the magazine had added objectionable language, including a reference to "trash[ing]" one's opponent, without his knowledge or consent. The altered article was pulled from electronic publication shortly thereafter, and Plaintiff's Letter to the Editor now takes its place.

Second, also in 1992, NK Associates was hired to assist Massachusetts Congressman John Olver ("Olver") in his reelection campaign against Republican candidate Patrick Larkin ("Larkin"). Plaintiff researched Larkin's background and provided the Olver campaign with information raising the possibility that several years earlier Larkin had held simultaneous jobs with two Congressmen but had filed reports disclosing only that he had worked for one. The Olver campaign used this information to attack Larkin as a "no show" employee, and to accuse him of "double-dipping" and "moonlighting." Larkin denied the accusation, and then proved that there was another Patrick Larkin with whom he had been confused.

Olver publicly apologized to Larkin, attributed the error to faulty research on Plaintiff's part, and demanded that Plaintiff refund the $8500.00 that his campaign had paid him. Plaintiff refused to refund the payment. These incidents were reported at the time in several Massachusetts newspapers, including the *Boston Globe,* the *Springfield Union News,* and the *Berkshire Eagle.*

Third, in the summer of 1996, it was publicly disclosed that Maine Republican primary candidate Robert Monks had hired persons to investigate rumors that his opponent, John Hathaway, had engaged in sexual relations with a 12–year–old babysitter. This issue received media attention.

Against this backdrop, the Court turns to the specific events giving rise to this suit. In the early fall of 1996, the Democratic Senate Campaign Committee ("DSCC") hired Commonwealth Consultants to conduct opposition research on then-Republican senatorial candidate Susan Collins ("Collins"), who was running against Democrat Joseph Brennan ("Brennan"). In the course of his research, Plaintiff traveled to Boston and obtained a copy of Collins's financial disclosure statement at the Massachusetts Ethics Commission ("MEC").[1] The MEC requires that any person seeking to obtain a copy of a government employee's financial disclosure statement complete an inspection request form. This form indicates that the requester should fill in his name, address, and signature, and identify his "affiliation" (the organization or person on whose behalf the information is being sought). The form also notifies the requester that a copy of the form will be forwarded to the subject of the inspection. Plaintiff wrote his name and home address on the form, and signed it. He identified his affiliation as "self." In the spots designated for "Affiliation" and "Requester's Address," Plaintiff

---

**1.** Collins was required to file such a statement in 1993 when she was employed by the Weld Administration.

began to write something (what that was is unintelligible), and then crossed it out.

The MEC then sent a copy of Plaintiff's request form to Collins. Collins gave the form to her campaign manager, Robert Tyrer ("Tyrer"). Tyrer conducted, or had a member of the Collins campaign staff conduct, some research on Plaintiff. That research turned up several newspaper articles that disclosed Plaintiff's role in the 1992 Massachusetts Olver/Larkin race. Tyrer contacted Day, a columnist for the *Bangor Daily News*,[2] told him what he knew of Plaintiff's background, and told him that Plaintiff had requested a copy of Collins's financial disclosure statement from the MEC.

After being contacted by Tyrer, Day did a number of things. He had an Internet/NEXUS record search done on Plaintiff and obtained some of the Massachusetts newspaper articles discussing the 1992 Olver/Larkin race. He obtained a copy of the MEC request form Plaintiff had filled out and a copy of the September 1992 *Campaigns & Elections* article attributed to Plaintiff. He spoke with Todd Webster, spokesman for the Brennan campaign, who denied knowledge that Plaintiff or any other opposition researcher had been hired to assist the Brennan campaign. He talked with Ben Scheffner, a reporter with the political journal *Roll Call*, about opposition researchers in general. Scheffner told Day, among other things, that opposition researchers are not private detectives. He spoke with Steve Jarding of the DSCC, who confirmed the organization's hiring of Plaintiff. He interviewed Larkin about Plaintiff's role in the 1992 Olver/Larkin race. He spoke again with Tyrer, who provided a statement on behalf of the Collins campaign.

In addition, on October 10, 1996, Day called Plaintiff and they had a conversation lasting approximately one minute. Day identified himself and asked if Plaintiff was working on the Maine Senate race. Plain-

tiff asked Day how he had obtained his phone number, explained that he could not speak to Day without his client's permission, and stated that he would check to see if the client would grant permission. Day then asked if the DSCC had hired Plaintiff, and Plaintiff again told Day that he could not speak on the record without his client's consent. He also suggested that Day could call whomever he suspected Plaintiff's client was to attempt to confirm his hiring. Plaintiff told Day that he would be happy to speak with him once he had his client's permission. Day then asked Plaintiff if the DSCC had hired him earlier to research Neil Bush and Silverado. Plaintiff said no, and added that to the extent Day had gotten that idea from a newspaper story to that effect, the story was inaccurate. Day asked Plaintiff to get clearance for an interview from his client and call him back. Plaintiff replied that he would call Day if the client permitted it, and regardless would suggest that the client call Day. Plaintiff and Day never spoke again.

Day then wrote a column that appeared in the October 12–13, 1996 edition of the *Bangor Daily News*. The story bore the headline "Dems hired investigator to dig dirt on Collins." (Defs.' Ex. 31.) The first line of the column stated: "Republican Senate candidate Susan Collins is being shadowed by a dirt-for-hire consultant with a checkered past." (Defs.' Ex. 31.) The column began on the front page with the word "analysis" inserted at the beginning of the text. It continued on page 2 of the newspaper. In the column, Day stated:

> A copy of a[MEC] document indicated that Norris began to fill out the Ethics Commission request form with the address of NK Associates, but crossed that out and wrote his home address. In the box where Norris was required to list his "affiliation["] (person or organization

---

**2.** Day writes columns that are published two or three times a week. In 1996, they typically

appeared on page 2 of the paper, accompanied by his photograph.

on whose behalf you are obtaining this report if any), Norris crossed out NK and wrote "self."

(Defs.' Ex. 31.) Day proceeded to characterize Plaintiff's notations on the form as a "subterfuge." (Defs.' Ex. 31.)

Day also stated in the article that a few years ago, ". . . the Democratic National Committee hired NK Associates to dig up dirt on former President Bush's son, Neil, who was the director of a failed Colorado savings and loan institution." (Defs.' Ex. 31.) In addition, Day referred to Plaintiff as a "private investigator," "investigator," or "private detective" at least ten times in the article. (Defs.' Ex. 31.)

Late Sunday, October 13, 1996, Day sent an electronic message to Tyrer, whom he describes as a "good friend" he has known for years. (Day Dep. At 29–31.) In the message, Day stated his intention to write a "wise-ass" article "for Tuesday" (October 15, 1996). (Pl.'s Ex. 2.) He went on to state that his Tuesday column would "Rehash JB's problem." (Pl.'s Ex. 2.) Day admitted at deposition that one aspect of the "problem" to which he was referring was how "handling the private investigator issue had hurt [Brennan]."[3] (Day Dep. at 245.)

Day wrote another column that was published in the *Bangor Daily News* on October 15, 1996. This column bore the headline "Munjoy Hill Joe: The glass jaw of Maine politics." (Defs.' Ex. 32.) The column ran on page 2 of the newspaper and was accompanied by Day's photograph. In it, Day stated:

> Given what happened to Bob Monks last June—after Monks hired a private investigator to track down rumors alleging that fellow Republican John Hathaway seduced a 12-year-old baby sitter—only a complete idiot would get mixed up with a Washington-based "opposition research" company. Certainly not one that disseminated totally bogus allegations against a Republican Massachusetts congressional candidate four years ago.
>
> Brennan did.
>
> Confronted Thursday morning with proof that the senior partner of NK Associates, one of Washington's top dirt-for-hire consultants, was poking around into Collins' past, Brennan put out a statement that might have been drafted by lawyers in the Nixon White House.
>
> . . . . .
>
> It took Brennan most of the weekend to figure out what he should have done in the first place—repudiate the DSCC and NK. By then the damage was done.

(Defs.' Ex. 2.)

Around 3:35 P.M. on October 18, 1996, counsel for the DSCC faxed a letter addressed to "Editor, Bangor Daily News," using the paper's published fax number. Defendants deny ever seeing this letter before a copy was provided in discovery. The letter identified factual errors contained in Day's October 12–13, 1996 article and requested a retraction.[4] The letter

---

3. Day's electronic message came to light because he inadvertently sent a copy of it to the DSCC, which then passed it along to a reporter at the *Portland Press Herald.* The reporter then wrote an article entitled "Columnist's Ties to Collins Campaign Annoy Brennan Camp," published on October 20, 1996 (Pl.'s Ex. 3.) When the reporter confronted Day with the message, Day initially would not confirm authorship, but then admitted he had written it. (Pl.'s Ex. 3.) Day went on to tell the reporter: "If you want to say this is some breach of ethics, fine. But I bent over backwards to be fair to Brennan." (Pl.'s Ex. 3.)

4. The letter made the following points: (i) Plaintiff is not a private investigator, (ii) the DSCC had not acknowledged its hiring of a "private investigator last month to probe Collins' background," (iii) Plaintiff was not hired "to dig up dirt," "to uncover damaging evidence," or "to unearth compromising information," (iv) the MEC form did not "confirm" that "a private investigator" was "active" in the Maine Senate race, (v) Plaintiff's notations on the MEC form were not a "subterfuge," (vi) Plaintiff was not a partner with NK Associates, and (vii) Plaintiff's role in the 1992 Olver/Larkin race did not constitute a "checkered past." (Pl.'s Ex. 4.)

also stated that any future story should "correct your reporter's past inaccuracies and avoid similar mistakes and misstatements ..." (Pl.s Ex. 4.) Attached to the letter was a statement by Plaintiff, specifying in more detail the factual misstatements made to date, and a copy of Day's electronic message to Tyrer.

The next day, a third column by Day appeared in the October 19–20, 1996 edition of the *Bangor Daily News.* The column, which ran on page 2 and was accompanied by Day's photograph, bore the headline "Researcher made big mistake back in 1992." (Defs.' Ex. 32.) The first line of the article stated: "Patrick L. Larkin doesn't pay much attention to politics these days, ever since a 'trash' for-hire artist ran him out of the game four years ago with a bogus smear." (Defs.' Ex. 32.) Day wrote that Plaintiff had "defamed" Larkin and used the phrase "Plot hatched by Norris" as a subheading in the article. (Defs.' Ex. 32.) He also repeated the assertion that Plaintiff previously had been hired to "dig up dirt" on Neil Bush. (Defs.' Ex. 32.) Day concluded the article by describing Plaintiff as a "trash-for-hire" investigator and noting that "[i]n the September issue of 'Campaigns and Elections,' a Washington magazine that writes about political consultants, Norris boasted if you want to 'trash' your opponent, his company has a proven method for getting results." (Defs.' Ex. 32.) Plaintiff asserts that the Internet/NEXUS search Day purports to have had conducted on him would have revealed that Plaintiff's draft article was altered without his permission to add the phrase "trash," that the altered article was pulled from electronic publication almost immediately, and that Plaintiff's Letter to the Editor now takes its place.[5]

5. Day claims that he obtained a hard copy of the altered article, though he does not remember how or where, and that he had no knowledge of its history.

# III. DISCUSSION

## A. Counts I, II, III, and IV—Defamation

■ In this diversity case, the parties appear to be in agreement that Maine law applies. In Maine, the tort of defamation consists of:

(a) a false and defamatory statement concerning another;

(b) an unprivileged publication to a third party;

(c) fault amounting at least to negligence on the part of the publisher; and

(d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*Lester v. Powers,* 596 A.2d 65, 69 (Me. 1991) (citing Restatement (Second) of Torts § 558 (1977)). Defendants, however, argue that the common law scheme does not apply in this case because Plaintiff is a limited purpose public figure who must hurdle the *New York Times v. Sullivan* actual malice standard.[6] The Court will identify the appropriate standard of proof before turning to the merits.

## 1. Applicable Standard of Proof

■ A defamation plaintiff may be classified in one of three ways: as a "public official," as a "public figure," or as a private person. Plaintiffs falling under either of the two former categories, as opposed to the latter, are subject to a higher burden of proof and may recover only where there is clear and convincing evidence that the defamatory statement was made with knowledge of its falsity or with reckless disregard for its truth or falsity. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Whether a plaintiff is a public official or public figure is a matter of law for the court to decide. *See Rosenblatt v.*

6. In the alternative, Defendants contend that even if Plaintiff is not a limited purpose public figure, the actual malice standard applies to his claims of presumed and punitive damages because the alleged defamatory statements involve a matter of public concern.

*Baer,* 383 U.S. 75, 88, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). In analyzing the public/private status of a plaintiff in a defamation case, the examination is limited to the time frame prior to the publication of the defamatory material. *See Ramirez v. Rogers,* 540 A.2d 475, 477 (Me.1988).

■ There are three categories of "public figures:" (i) public figures for all purposes (those who have "assumed roles of especial prominence in the affairs of society," who have achieved "pervasive fame or notoriety," or who "occupy ... positions of ... persuasive power and influence"), (ii) involuntary public figures (those who attain the status through no purposeful action), and (iii) limited purpose public figures (those who "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved"). *See Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583, 588 (1st Cir.1980) (quoting *Gertz,* 418 U.S. at 345, 351, 94 S.Ct. 2997). In this case, Defendants urge the Court to designate Plaintiff a "limited purpose public figure"—a public figure for the limited purpose of his role in the 1996 Maine Senate race.

Pinpointing a standard for ascribing limited purpose public figure status is a difficult matter. The First Circuit has evaluated a plaintiff's asserted "limited purpose public figure" status in only two cases: *Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583, 588 (1st Cir.1980) (corporate plaintiff), and *Pendleton v. City of Haverhill,* 156 F.3d 57 (1st Cir.1998) (individual plaintiff). Both cases reveal that limited purpose public figure determinations do not lend themselves easily to formulaic analysis. *See Pendleton,* 156 F.3d at 70–71 ("Our conclusion here, as in most public figure cases, is factbound and restricted to the specific circumstances revealed in the record."); *Bruno,* 633 F.2d at

589 ("particularized determinations of public figure status are the rule").

■ What one can discern from both *Bruno* and *Pendleton* is that a court's first task is to evaluate whether a public controversy existed prior to the defamatory publication. *See Bruno,* 633 F.2d at 590. Identification of the implicated public controversy is not a mere formality. *See Hutchinson v. Proxmire,* 443 U.S. 111, 135, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979) (noting that identification of proper "public controversy" is crucial to fair balancing of interests). Although no clear-cut test has been established in this Circuit, several things are clear: purely private disputes do not give rise to public controversies, the implications of the controversy in question must affect the public and not merely the litigants, and the public importance of the issues involved must be considered. *See Quantum Electronics Corp. v. Consumers Union of United States, Inc.,* 881 F.Supp. 753, 764 (D.R.I.1995). Defendants define the relevant public controversy as being the 1996 Maine Senatorial campaign, which was in progress before the alleged defamation. Based on the above enumerated factors, the Court is in agreement. While Plaintiff argues that the race was not "controversial" until Day wrote the articles in question,[7] this argument goes not so much to the existence of a preexisting "public controversy" as it does to the question of whether Plaintiff voluntarily injected himself into the controversy or was "dragged unwillingly into [it]." *Wolston v. Reader's Digest Ass'n. Inc.,* 443 U.S. 157, 166, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979). This issue will be addressed below.

■ Having identified the relevant public controversy, the Court next must evaluate whether Plaintiff injected himself into that controversy. This requires "looking to the nature and extent of [the plaintiff's] participation in the particular controversy giving rise to the defamation." *See Bruno,*

---

7. In support of this contention, Plaintiff notes that in the October 12, 1996, article, Day referred to Plaintiff's presence in the cam-

paign as "the first serious sparks in Maine's until now relatively genteel Senate race." (Defs.' Ex. 31.)

633 F.2d at 591 (quoting *Gertz*, 418 U.S. at 352, 94 S.Ct. 2997).

Defendants contend that Plaintiff, who has worked on hundreds of political campaigns, injected himself into the 1996 Maine Senate race by accepting a contract with the DSCC to perform work relating to the race, work that in fact was intended to influence the outcome of the race.[8] They also assert that Plaintiff had easy access to the press, evidenced by Day's attempts to interview him, and observe that an article was published under Plaintiff's name in *Campaigns & Elections* magazine and that he has advertised his professional services in that national trade journal as well. Finally, Defendants point to the Massachusetts press coverage of the 1992 Olver/Larkin campaign fiasco and argue that Plaintiff's role in those events rendered him a limited purpose public figure in any subsequent campaign, since he became a liability to any future client.

Although the First Circuit has not formulated a "test" on this issue, the Court's analysis is informed by the three considerations that drive application of a higher standard of proof to public figures:

> First, the standard strikes the most appropriate balance between the state's interest in protecting reputation and the 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.... Although calculated falsehoods remain outside the core of the First Amendment, erroneous misstatements are inevitable in a robust system of free expression.' Second, public figures assume the risk of defamatory statements leveled against them because by 'thrust[ing] themselves to the forefront of particular public controversies ... they invite attention and comment.' Lastly, public figures more readily may

resort to self-help, minimizing the need for judicial protection against defamation. 'Public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy.'

*Faigin v. Kelly*, 978 F.Supp. 420, 426 (D.N.H.1997) (citations omitted) (designating sports agent allegedly defamed in former client's autobiography limited purpose public figure). Bearing these considerations in mind, the Court concludes that Plaintiff was a public figure for the limited purpose of his role in the 1996 Maine Senate race. Plaintiff voluntarily accepted a job researching a candidate for national office on behalf of a national political organization. He cannot be described as an "unwilling[ ]" participant in the election controversy, which was an extremely important public issue. *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 166, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979). Moreover, it appears that Plaintiff was well aware of the perils of this project. According to Plaintiff's own submissions, he apparently guaranteed the DSCC that he would not speak to the press without its permission, as is his policy with all of his clients. (Pl.'s Ex. 1.) In other words, he knew that his work would invite attention and comment, as it has in the past. This detail is evidence not only of some assumption of risk, but also of Plaintiff's heightened access to media outlets.

Plaintiff's resistance to limited public figure status is two-fold. First, Plaintiff asserts that he "had enjoyed relative obscurity among political professionals" and his work kept him "behind the scenes" until Day's articles appeared. (Pl.'s Resp. Defs.' Mot.Summ.J. at 3.) It was Defen-

---

**8.** Indeed, according to Defendants, by virtue of the very nature of his job as an opposition researcher, Plaintiff is perpetually thrust "into the American political arena, which by its nature is a public forum in which important issues of legitimate public concern are re-

solved." (Defs.' Reply at 3.) This position suggests that opposition researchers, as a professional class, are by definition limited purpose public figures, and the Court rejects it. As discussed above, generalizations are particularly inappropriate in this area of the law.

dants' defamatory actions, according to Plaintiff, that catapulted him to the public stage. Second, Plaintiff argues that to deem him a limited purpose public figure because he worked on Brennan's campaign means that anyone involved in a campaign, even phone bank volunteers, will be subject to that status.

■ It is beyond doubt that defendants in defamation suits may not "create their own defense by making the claimant a public figure." *Hutchinson v. Proxmire*, 443 U.S. 111, 135, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979). The Court is persuaded, however, that this was not the case here. In this case, Plaintiff voluntarily entered the Maine political fray in the wake of the Monks/Hathaway and Olver/Larkin incidents, both of which had stirred debate about the use of opposition researchers in political campaigns and had received considerable public attention (in Maine in 1996 and in Massachusetts in 1992, respectively). The fact that Plaintiff's name may have been unfamiliar to the public until Defendants published the articles in question does not defeat his limited purpose public figure status. As one court has reiterated:

> Creating a public issue ... is not the same as revealing one. The purpose of investigative reporting is to uncover matters of public concern previously hidden from the public view. We agree with the District of Columbia Circuit that the first newspaper to report on a pre-existing public dispute should not be held to a stricter standard of liability than those who follow. To hold otherwise would undermine the purpose of the public-figure doctrine-encouraging debate on issues of public concern.

*Nicholson v. Promotors on Listings*, 159 F.R.D. 343, 345 (D.Mass.1994) (quoting *Trotter v. Jack Anderson Enterprises, Inc.*, 818 F.2d 431, 434 (5th Cir.1987)). While it seems certain that Plaintiff did

not wish to be publicly identified in connection with the election, his preference does not guide the Court's determination. Plaintiff is the head of a national opposition research firm and has both drawn and embraced media attention in the past. As one court has put it, "[the plaintiff] may not now hide behind a cloak of privacy when the publicity turns negative." *Faigin v. Kelly*, 978 F.Supp. 420, 428 (D.N.H. 1997) (finding that sports agent had "thrust himself to the forefront of a high-profile community of sports agents that attracted media attention and publicity").

■ As to Plaintiff's second objection, the Court wishes to be clear in the limits of its decision. The Court does not hold that any person associated with a political campaign is a limited purpose public figure. Rather, the Court has concluded that this particular plaintiff, based on the specific circumstances surrounding his participation in the 1996 Maine Senate race, was a public figure for the limited purpose of that race. The Court is confident that courts will be able to distinguish among various politically-affiliated plaintiffs based on an application of the factors discussed above to the particular facts presented.

### 2. The Articles

Plaintiff argues that the three articles, read both independently and as a whole, constitute defamation. Defendants' Interrogatories requested that he identify the particular statements challenged, and Plaintiff specified approximately forty particular statements as actionable.[9] In their Motion for Summary Judgment, Defendants isolate each of the approximately forty statements individually and urge the Court to find that they are nonactionable for a number of reasons, including that: (i) certain of the challenged statements are true, (ii) certain of the challenged statements are not defamatory, (iii) cer-

---

9. For brevity's sake, the Court has not recounted each and every challenged statement

in the preceding factual discussion.

tain of the challenged statements are protected expressions of opinion or rhetorical hyperbole, (iv) certain of the challenged statements are not "of and concerning" Plaintiff, and (v) to the extent certain challenged statements are false, there is no evidence that Day made them with knowledge of or with reckless disregard as to their falsity.

 At this stage of the proceedings, the Court declines to evaluate the articles in this manner. *See Powell v. Radkins*, 506 F.2d 763, 765 (5th Cir.1975) (citing 6 J. Moore, Federal Practice ¶ 56.15(6), at 2427.) ("A court, in its discretion in shaping the case for trial, may deny summary judgment as to portions of the case that are ripe therefor, for the purpose of achieving a more orderly or expeditious handling of the entire litigation"); 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2737 ("if the court determines that entering a partial summary judgment by identifying the facts that may no longer be disputed would not materially expedite the adjudicative process, it may decline to do so"). The Court is convinced that parsing the articles in a virtual vacuum does not promote productive analysis at the summary judgment stage. For example, when engaging in fact versus opinion analysis, courts applying Maine law must look to the "totality of the circumstances." *See Lester v. Powers*, 596 A.2d 65, 71 (Me. 1991). The court should consider the challenged statement

> in its totality, in the context in which it was uttered or published, considering all the words used, not merely particular phrases or sentences, giving weight to cautionary terms used by the person publishing the statement, and considering all of the circumstances surrounding the statements, including the medium by

which the statement is disseminated and the audience to which it is published. *Flotech, Inc. v. E.I. Du Pont de Nemours Co.*, 627 F.Supp. 358, 367 (D.Mass.1985). Dissecting these articles line by line will not allow this type of meaningful evaluation.

 Rather, the Court is satisfied that the evidence raises a genuine issue of material fact as to the actionability of these articles and consequently denies the Motion for Summary Judgment. A publication is defamatory if it "tends to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Bakal v. Weare*, 583 A.2d 1028, 1030 (Me.1990). At the same time, a defamation claim may not be based on a reading that interprets the language according to the most negative connotation possible. *See id.* at 1030. Here, Day's statements about Plaintiff over the course of the three articles assert, in various forms, that he is a "dirt-for-hire consultant with a checkered past." The import of this assertion is clearly "defamatory" according to the standard described above. Furthermore, on the record before it, the Court cannot conclude as a matter of law that the defamatory "sting" of the articles—that Plaintiff is an unscrupulous hired hand with an unsavory history—is substantially true.[10]

 Finally, at least at this stage, the Court is persuaded that Plaintiff has raised a genuine issue of material fact with respect to whether Day acted with actual malice. Plaintiff has adduced evidence that, prior to publication of the articles, Day had in his possession information (stemming from his interviews and document research) to the effect that in fact Plaintiff was not a private detective or investigator, that Plaintiff had not conduct-

---

10. Defendants submitted a number of Plaintiff's written opposition research reports about various political candidates and offer them as evidence that Plaintiff is, in fact, a "dirt-for-hire consultant." (Defs.' Exs. 4–11.)

While these reports reveal that Plaintiff's research often turns to the personal lives of the candidates he is researching, the Court does not consider this fact dispositive at the summary judgment stage.

ed opposition research on Neil Bush, that Plaintiff's role in the Olver/Larkin incident was not part of a "plot" to "defame" Larkin, and that Plaintiff did not describe himself as someone who "trash[es]" others for a living. While the Court is aware that "failure to follow journalistic standards and lack of investigation may establish irresponsibility or even possibly gross irresponsibility, but not reckless disregard of the truth," *Faigin v. Kelly*, 978 F.Supp. 420, 429 (D.N.H.1997), two additional factors stressed by Plaintiff are relevant here. First, Day's electronic message to his "good friend" Tyrer, Collins' campaign manager, promising a "wiseass article for Tuesday" about the private investigator issue, supports an inference that Day's motives in writing the articles were at least as political as they were journalistic. Second, a question of fact exists as to whether Day received the faxed letter from Plaintiff's counsel noting the alleged inaccuracies prior to the publication of his third article. In light of these material factual questions, the Court is convinced that granting summary judgment would be inappropriate. Defendants' Motion for Summary Judgment as to Counts I, II, and III is denied.

### 3. Respondeat Superior

BPC apparently concedes that to the extent Day is liable under Counts I–III, it will be vicariously liable for his actions under Count IV. Since the Court has denied summary judgment on Counts I–III, it also denies summary judgment as to Count IV.

### 4. Punitive Damages

Defendants contend that Plaintiff's claim for punitive damages is governed by *Tuttle v. Raymond*, 494 A.2d 1353 (Me.1985), and must fail because he cannot demonstrate by clear and convincing evidence that Defendants acted with subjective ill will or in a manner so outrageous that malice toward Plaintiff can be implied. Defendants assert that Day's columns were commentary on the 1996 Maine Senate race of interest to the Maine electorate, and that there is nothing outrageous about a newspaper accurately commenting on such issues.

Plaintiff counters that in *Rippett v. Bemis*, 672 A.2d 82, 89 (Me.1996), the Maine Law Court dispensed with requiring a showing of *Tuttle* malice in cases of libel per se because, under those circumstances, malice is implied. Plaintiff asserts that this is a case of libel per se and therefore the malice required to support a claim for punitive damages may be assumed without resorting to *Tuttle* analysis.

■ This Court recently reiterated that in Maine, punitive damages may be awarded only where the plaintiff demonstrates common law actual malice. *See Veilleux v. National Broadcasting Co., Inc.*, 8 F.Supp.2d 23, 42 (D.Me.1998). The common law "actual malice" showing required to support a punitive damages claim is distinct from the "actual malice" standard applied in certain defamation contexts. *See Veilleux*, 8 F.Supp.2d at 42 (common law actual malice rests on showing of ill will or conduct so outrageous that malice is implied, whereas actual malice for purposes of defamation rests on showing that defamatory statement was made with knowledge of its falsity or with reckless disregard for its truth or falsity); *Lester v. Powers*, 596 A.2d 65, 69 n. 7 (Me. 1991) (" 'actual malice,' a term of art in defamation, has no connection with malice in its usual sense of ill will"). Common law actual malice also bears no relation to the concept of "implied malice" that drives the per se actionability of limited categories of defamatory statements. *See Saunders v. Van Pelt*, 497 A.2d 1121, 1124–25 (Me.1985) (in designated circumstances where malice is implied, plaintiff may recover compensatory damages without proving special damages).

The Court has reviewed a number of Maine cases involving plaintiffs who were slandered per se and asserted punitive damages claims. In each, the Maine Law

Court subjected the plaintiff's punitive damages claim to *Tuttle's* requirement of "actual malice." *See Haworth v. Feigon,* 623 A.2d 150, 159 (Me.1993) ("The plaintiff must show by clear and convincing evidence that the conduct was motivated by actual ill will, or that the conduct was so outrageous that malice is implied."); *Ramirez v. Rogers,* 540 A.2d 475, 478 (Me. 1988) (same); *Saunders v. VanPelt,* 497 A.2d 1121, 1127 (Me.1985) (same). In *Saunders,* the Law Court made the following observation: "The law is well settled that when the words found to have been used are slander per se, it is not necessary for the plaintiff to prove special damages or actual malice in order to recover a substantial amount. Actual malice may be shown for the purpose of enhancing damages." *Saunders,* 497 A.2d at 1126 (quotations omitted). Thus, Maine law seems clear that while "implied malice" generally serves as the basis for presumed damages,[11] it takes a more substantial showing to support a claim for punitive damages.

In *Rippett,* the case cited by Plaintiff, the Law Court vacated the trial court's grant of summary judgment as to both the plaintiff's tort claims and the claim of punitive damage.[12] *Rippett,* 672 A.2d at 89. The Court stated that the defendant could be liable for punitive damages if it was shown that he defamed the plaintiff with "express or implied 'malice.'" *Id.* It went on to say:

> Language imputing criminal conduct is actionable per se; malice in law is implied and no evidence of "malice in fact" is necessary. *Saunders v. VanPelt,* 497 A.2d at 1126. Thus, to the extent it is found that [the defendant] defamed [the plaintiff] by his remarks, the summary judgment entered in favor of [the defendant] on [the plaintiff's] Count VI complaint for punitive damages constitutes error.
>
> *Id.*

■ Plaintiff's reliance on *Rippett* is understandable, as this brief passage seems to imply that a plaintiff who has been libeled per se, as he alleges he has been in this case, need not show common law actual malice to support a punitive damages claim. The Court cannot conclude, however, based on these few sentences, that the Maine Law Court has changed course in such a dramatic fashion with respect to the standard applicable to punitive damages in the defamation context. Thus, the Court is persuaded that Plaintiff's punitive damages claim is subject to the *Tuttle* standard and he must show either subjective ill will or outrageous conduct.

The Court cannot say, however, on the record before it, that Defendants' conduct, if true, was not so outrageous that malice cannot be implied. Defendants' Motion for Summary Judgment as to punitive damages is denied.

## B. Count V—Negligent or Intentional Infliction of Emotional Distress

■ In *Rippett v. Bemis,* 672 A.2d 82 (1996), the Maine Law Court held that where claims of negligent or intentional infliction of emotional distress are based on alleged defamatory statements, these claims are subsumed by any award for defamation. *See Rippett,* 672 A.2d at 87–88 ("If defamation is proved, compensatory damages may include the elements of mental suffering, humiliation, embarrassment, effect on reputation and loss of social standing so far as they have been proved

---

**11.** One exception exists in cases where the plaintiff is a private party who was defamed in the course of speech on a matter of public concern. In such cases, even presumed damages are subject to the defamation "actual malice" standard. *See Levinsky's, Inc. v. Wal-Mart Stores, Inc.,* 127 F.3d 122, 132 (1st Cir.1997)

**12.** The trial court had deemed the plaintiff's punitive damages claim moot in light of the entry of summary judgment on all of her tort claims. *See Rippett,* 672 A.2d at 89.

and may reasonably be presumed."). Since Plaintiff's emotional distress claim is grounded solely in Defendants' allegedly defamatory publications, it is swallowed by his surviving defamation claims. Defendants' Motion for Summary Judgment as to Count V is granted.

## C. Count VI—Tortious Interference with Existing and Prospective Business Advantage

In Maine, a plaintiff may recover for tortious interference with existing and prospective business advantage upon a showing of (i) an existing contract or prospective economic advantage, (ii) interference with that contract or advantage through fraud or intimidation, and (iii) damages proximately caused by the interference. *See Petit v. Key Bank of Maine,* 688 A.2d 427, 430 (Me.1996). Defendants argue that this claim must fail because Plaintiff cannot demonstrate either the existence of a contract or prospective business advantage or that Defendants interfered with that contract or advantage by fraud or intimidation. Plaintiff responds that he has satisfied the first element, the existence of a prospective economic advantage, because the evidence indicates that he makes his living doing research for political clients. He further asserts that he has satisfied the second element, a showing that Defendants interfered with the prospective advantage by fraud or intimidation, based on evidence that they defamed him, conduct which had the potential to deter prospective employers from engaging his services.

The Court concludes that Plaintiff has failed to satisfy the first element of this cause of action, the existence of a prospective business advantage. Plaintiff admits he "is unable to point to specific contracts he has lost as a result of these articles," but asserts that he has identified potential employers who would not have hired him for the next election cycle. (Pl.'s Resp. Mot.Summ.J. at 16.) An examination of Plaintiff's deposition testimony reveals

that these "potential employers" were persons responding to Plaintiff's general, hypothetical query about his employability in the wake of the articles, (Norris Dep. at 662–674.), rather than prospective employers in an immediate or even ongoing sense. *Cf. James v. MacDonald,* 712 A.2d 1054, 1056 (Me.1998) (plaintiffs "had ongoing relationships with urchin divers from whom they bought urchins and with Atlantic Seafood to whom they sold urchins"). While these people theoretically might have been sources of work for Plaintiff, the relationship between Plaintiff and these "potential employers" is in this case is too attenuated and speculative to support this claim. Defendants' Motion for Summary Judgment as to Count VI is granted.

## III. CONCLUSION

For the reasons discussed above, Defendants' Motion for Summary Judgment as to Counts I–III is DENIED, as to Count IV is DENIED, as to Count V is GRANTED, as to Count VI is GRANTED, and as to punitive damages is DENIED.

*SO ORDERED.*